RIO GRANDE BUILDING & LOAN ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72236.    Filed July 12, 1961.

*Howard J. Stafford, Jr., Esq.*, and *Robert L. Schwarz, Esq.*, for the petitioner.

*Robert L. Liken, Esq.*, for the respondent.

FISHER, *Judge:* The Commissioner determined deficiencies in income tax of Rio Grande Building & Loan Association (hereinafter sometimes called the association) as follows:

| | |
|---|---|
| 1953 | $14,520.00 |
| 1954 | 17,234.21 |
| 1955 | 22,522.26 |
| Total | 54,276.47 |

The issue for our determination is whether petitioner, during any or all of the years in issue, is to be allowed any deduction for bad debts under the reserve method, and, if so, in what amount under section 23(k)(1) of the 1939 Code and section 593 of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioner is organized under the laws of Texas as a domestic savings and loan association. It is subject to the supervision of the banking commissioner of the State of Texas but it is not a member of the Federal Home Loan Bank System and its accounts are not insured by the Federal Savings and Loan Insurance Corporation.

During the years in issue, 1953 through 1955, all of the profits

before bad debt deductions were transferred to an undivided profits account. Transfers were then made from this account to one or more reserve accounts. Petitioner, as of the end of 1955, had established on its books three separate reserve accounts and had credited various amounts to them over the 3-year period. These accounts were called the Legal Reserve, General Loss Reserve, and Reserve for Contingencies.

The legal reserve account was originally established pursuant to the regulations of the State Banking Department to provide a reserve against bad debts and loans. The balance of this account as of December 31, 1952, was $110,000. This amount was accumulated while petitioner was not subject to Federal income taxes.

After the Federal law went into effect providing for the taxation of the profits of the association and the allowable deduction for bad debts, the association in 1953 set up a general loss reserve account as an addition to a bad debt reserve account. The only transfer to this account was the amount of $5,371.21 in 1953.

On December 31, 1955 (the last day of the period in issue), the association established a third reserve account, Reserve for Contingencies, with the transfer of $35,629.78 from undivided profits.

The following Schedule A is a summary of the transactions concerning undivided profits and the various reserve accounts for the taxable years 1952 through 1955.

SCHEDULE A

| Year | Transaction | Undivided profits | Legal reserve | General loss reserve | Reserve for contingencies | Dividends stock and cash |
|------|-------------|-------------------|---------------|----------------------|---------------------------|--------------------------|
| 1952 | Balance | $20,117.73 | $110,000 | | | |
| | Profit for year | 22,466.27 | | | | |
| | Dividends | (10,000.00) | | | | 1 $20,500 |
| 1953 | Balance | 32,584.00 | 110,000 | | | 20,500 |
| | Profit for year 2 | 39,308.87 | | | | |
| | Dividends | (31,000.00) | | | | 31,000 |
| | To reserves | (15,371.21) | 10,000 | $5,371.21 | | |
| | Transfer for unknown reasons | | | 3 (662.00) | | |
| | Dividends from reserve | | (7,500) | | | 7,500 |
| 1954 | Balance | 25,521.66 | 112,500 | 4,709.21 | | 59,000 |
| | Profit for year 3 | 43,719.15 | | | | |
| | To reserves | (30,000.00) | 30,000 | | | |
| | Dividends from reserves | | (15,000) | | | 15,000 |
| 1955 | Balance | 39,240.81 | 127,500 | 4,709.21 | | 74,000 |
| | Profit for year 2 | 53,888.97 | | | | |
| | Dividends | (25,000.00) | | | | 25,000 |
| | To reserves | (58,129.78) | 22,500 | | $35,629.78 | |
| | Dividends from reserve | | (10,000) | | | 10,000 |
| | Balance | 10,000.00 | 140,000 | 4,709.21 | 35,629.78 | 109,000 |

1 Source of $10,500 dividends unknown.
2 Before deduction for addition to bad debt reserve.
3 Not established in record but presumably a bad debt writeoff.

Petitioner treated the pre-1952 accumulation in the legal reserve account of $110,000 as a free reserve and it was its intention that the dividends paid out of the account during the years in issue in

the amount of $32,500 were to be taken from the accumulation rather than from the current additions during the years in issue.

The books, records, and income tax returns of the association were on a calendar year basis using an accrual method of accounting.

For the taxable years 1953 through 1955, petitioner filed its Federal corporation income tax returns (Form 1120) with the district director of internal revenue, Austin, Texas.

On December 13, 1956, petitioner and respondent executed Form 872 extending the statute of limitations for the taxable year 1953 to June 30, 1958.

On each of the returns filed by petitioner for the years 1953 through 1955, following the amount of net income for the year, appeared the following statement: "Tax exempt, Reserve less than 12% of deposits."

In each of the returns there was incorporated a Schedule F (Bad Debts) and these are summarized in Schedule B as follows:

SCHEDULE B

| Year | Withdrawable accounts as of close of year | 12 percent of withdrawable accounts | Surplus, undivided profits and reserves at beginning of year | Maximum deduction excess of column 2 over 3 | Net income before bad debt deduction |
|------|------|------|------|------|------|
| 1953 | $3,484,450.81 | $418,134.10 | $142,584.00 | $275,550.10 | $39,308.87 |
| 1954 | 4,891,503.20 | 586,980.38 | 138,021.66 | 448,958.72 | 43,719.63 |
| 1955 | 6,637,713.07 | 796,525.57 | 171,450.50 | 625,075.07 | 53,888.97 |

Petitioner claimed to be fully exempt from all income tax on the ground that the maximum allowable deduction determined under the Code exceeded its income in all of the years in issue.

In the deficiency letter addressed to petitioner, respondent determined that the only allowable bad debt deduction for all of the years in issue was the amount added to the general loss reserve account in 1953 ($5,371.21), limited to the excess of the net income for the year ($39,308.87), over the dividends paid during the year ($38,500). A net amount of $808.87 was, therefore, allowed as a deduction. Respondent now concedes petitioner's right to deduct for 1953 the amount of $5,371.21 above referred to. No bad debt deductions were allowed for the years 1954 and 1955.

The general loss reserve and legal reserve were bona fide bad debt reserve accounts to the extent of credits to said accounts in 1953, 1954, and 1955.

OPINION.

Prior to the enactment of the Revenue Act of 1951, a domestic building and loan association such as petitioner was exempt from Federal income tax under the provisions of section 101(4), I.R.C. 1939. This exemption was repealed by section 313(b) of the Revenue

Act of 1951, effective for all taxable years beginning after December 31, 1951. At the same time, section 23 (k) (1) of the 1939 Code, as amended, relating to the deduction for bad debts, was further amended by section 313 (e) of the 1951 Act to read as follows:

> (k) BAD DEBTS.—
>
> (1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * In the case of a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of (A) the amount of its net income for the taxable year, computed without regard to this subsection, or (B) the amount by which 12 per centum of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year.

The part referring to savings institutions was thereafter incorporated in substance in section 593 of the 1954 Code.

Petitioner elected to use the reserve method of deducting bad debts during the 3 years in issue, and its use is not challenged by respondent. The only issue in this case is the amount which may be deducted by petitioner each year under the reserve method.

Based upon the formula laid down in the Code, it is clear, and agreed between the parties, that for all 3 years in issue petitioner could have added to its bad debt reserve account an amount equal to its net income and could have deducted as a bad debt expense the amount so added to the reserve account. See Schedule B, *supra.*

Petitioner, on its income tax returns for all 3 years, however, did not claim it transferred to a reserve account any particular amount. It merely claimed to be exempt from all income tax solely on the ground that the amount determinable under the Code as a reasonable reserve addition for each year exceeded its net income. Petitioner in fact never transferred to any reserve account an amount equal to its claimed deductions (i.e., an amount equal to its net income) during any of the years involved.

Respondent's reasons for disallowance of the deductions claimed by petitioner are threefold. First, he maintains that in no event can a taxpayer, using the reserve method, deduct an amount greater

than it has timely transferred to a reserve account. Second, respondent contends that, except for the general loss reserve, there were no bona fide bad debt reserves on the books, arguing that both the legal reserve and the reserve for contingencies were invaded at one time or another for the payment of dividends. Third, respondent contends that if these accounts are determined to be valid bad debt reserves, the annual deduction should be limited to the net amount transferred to the account after deducting the current dividends which have been paid out of the account.

The general loss reserve was credited with the amount of $5,371.21 in 1953, the only transfer to that account during the 3-year period. Initially, respondent did not allow that amount as a bad debt deduction for 1953 but reduced the allowable deduction to $808.87, the difference between the net income for the year 1953 ($39,308.87) and the dividends paid that year ($38,500). Respondent, on brief, however, now agrees that the entire amount of $5,371.21 should be an allowable deduction for 1953.

*Issue 1.*

The first issue for our consideration is whether or not an association such as petitioner may deduct the full amount of its allowable deduction under the Code, albeit such amount was never actually transferred to a reserve account on its books.

It has been settled that savings and loan associations are subject to the same requirements concerning the maintenance of reserve accounts as are all other taxpayers. The Code provision pertaining to them does not give them an automatic deduction, but merely states what is a reasonable addition to a reserve account which will be an allowable deduction. See *Arcadia Savings & Loan Association*, 34 T.C. 679 (1960), where we said (p. 681) :

The petitioner's contention is that the amount which Arcadia was allowed to deduct in 1952 under section 23(k)(1), as amended and made applicable to that year, was intended by Congress to be exempt from tax, was not actually an addition to the reserve for bad debts, and is not to be included in income under the rule above stated. They argue that Congress intended the amount in question to be an addition to surplus rather than an addition to a reserve for bad debts and attempt to support this argument by statements of several Senators made when the amendment in question was being considered in Congress. Due consideration has been given this contention and argument of the petitioners, but the Court is not persuaded that the deduction of $259,931.32 taken in 1952 under section 23(k)(1) is to be treated differently from any other deduction taken as an addition to a reserve for bad debts.

Petitioner contends on brief that it was confused by the Code and that the entries were delayed with the honest belief that respondent would, upon examination of its books, permit the proper entries that

should have been made. We see no ambiguity in the Code provision or any basis for confusion. A reading of section 23 (k) (1) indicates the clear requirement that a reserve account must be established to qualify for a bad debt deduction if the taxpayer chooses the reserve method. The new section relating to savings and loan associations does not change the established rule concerning maintenance of reserves. It merely states how a reasonable addition to a reserve account should be determined.

Section 39.23 (k)–5 (b) (3), Regs. 118, interpreting section 23 (k) (1), I.R.C. 1939, states, in part:

The establishment of such [bad debt] reserve and all adjustments made thereto *must be reflected on the regular books of account of the institution at the close of the taxable year, or as soon as practicable* thereafter. * * * [Emphasis supplied.]

Although the Code section does not expressly state that the amount sought to be deducted as a reserve for bad debts must be reflected on the books of the taxpayer, the regulations implementing the Code state a clear and obvious requirement to do so. We think the regulation sets forth a reasonable administrative requirement and is in no sense inconsistent with the provisions of the Code. A reserve for bad debt deductions is not a statutory deduction, allowed irrespective of any bookkeeping entries establishing a reserve. In this respect it is unlike a true bad debt deduction where a taxpayer may deduct a worthless debt without maintaining any books of account.

When a taxpayer elects to adopt the reserve method of deducting bad debts, he is allowed a reasonable addition and corresponding deduction each year even though no debts became worthless during the year. This amount, however, must be expressly set aside on the books of the company to provide a reserve for future losses. The underlying reason is that if, upon the association's liquidation, there remains a balance in the reserve account, or the reserve is invaded for other purposes, the association must pay income taxes in relation to this amount, since the amount represents deductions in prior years which never actually represented bad debts. *Arcadia Savings & Loan Association, supra.*

The privilege of deducting amounts for bad debts before they are ascertained is not without condition. The association must earmark this amount and cannot under penalty of having the amount restored to income use it for any purpose other than to apply against bad debts as they occur. Allowing a taxpayer to deduct amounts for losses which have not yet occurred, and at the same time allowing it to use such amounts currently for other purposes, would clearly circumvent the intention of the provisions of the Code.

In 1953, respondent issued a ruling concerning a situation similar to that in the instant case. It stated in part:

the amount of income so allocated to undivided profits under circumstances not foreclosing its availability for dividend distribution will not be deemed to have been credited to the bad debt reserve * * *, and such amount is not deductible from gross income. Additional credits to reserves of the type contemplated in section 29.23 (k)-5(b)(3)(ii) furnish additional protection against loss to the depositors or owners of withdrawable accounts and are treated as deductions for income tax purposes. Accordingly, the amount of income allocated to undivided profits is subject to Federal income tax * * *. [Rev. Rul. 182, 1953-2 C.B. 120.]

We agree with this ruling as a practical application of the Code. Inasmuch as the sole basis for the deduction is that a reserve account was in fact established, a situation which allows a taxpayer unrestricted use of such amounts is not to be permitted.

The Code does not state when the entries are to be made. The regulations, however, clarify any doubt by stating that the "establishment of such reserve and all adjustments thereto must be reflected on the regular books of account of the institution at the close of the taxable year, or as soon as practicable thereafter." Sec. 39.23 (k)-5 (b) (3), Regs. 118.

The regulations thus recognize variations in general accounting procedures and, we believe, correctly do not establish an absolute time limit by which the entries must be made on the books. Ordinary business practices necessitate the allowance of a reasonable time after the close of the year for the auditing of the books, the physical notation of the closing entries to profit and loss, and the adjusting entries, including the entries to the various reserve accounts. While we do not intend to establish such a time limit, generally the limit should be not later than the time at which the taxpayer files its income tax return for the year involved. At that time, it is in a position to ascertain what would be a reasonable amount to add to the reserve account, and can determine what the net income is if it is a factor limiting the amount of the allowable reserve deduction.

Petitioner next argues that, since a deduction in the amount of its net income would have been allowed if proper additions to a reserve were timely made, it should be allowed to make the entries now, inasmuch as its intention to take advantage of the full deduction was manifested on its returns.

We think there can be no doubt that a taxpayer is not to be permitted to enlarge its reserve account retroactively, based upon subsequent events which later support the view that the reserve is inadequate. In such a situation, the added amount would not be a reasonable addition as of the end of the year involved and therefore is not allowable. *Farmville Oil & Fertilizer Co.*, 30 B.T.A. 1048 (1934), affd. 78 F. 2d 83 (C.A. 4, 1935).

The element of subsequent events and reasonableness of the reserve are, however, absent in the instant case. Therefore, we are left with the question of whether a taxpayer may, in a subsequent year, increase its bad debt reserve account to a level which would have been reasonable and allowable as a deduction if timely made.

The Code allows a bad debt deduction for "a reasonable addition to a reserve for bad debts." Sec. 166(c), I.R.C. 1954. Section 23(k)(1), I.R.C. 1939, and section 593, I.R.C. 1954, also state, subject to prescribed limitations, that in the case of savings and loan associations "the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the *amount determined* by the taxpayer as the reasonable addition for such year: * * *." (Emphasis supplied.) The Code does not state that a reasonable amount may be deducted, but states that an amount *determined* by the taxpayer as the reasonable amount may be deducted. It follows, therefore, that this amount cannot be *greater* than the amount determined to be a reasonable reserve addition at the end of each year, albeit a larger amount would have been reasonable and allowable if it had been so determined.

The intention to avail itself of a larger deduction is not the decisive factor. The deduction is predicated upon what a taxpayer determines its reserve should be rather than what it determines its deduction should be. Under the circumstances of the instant case, where the taxpayer has made its determination and has not changed it within a reasonable time, it may not, at a later date, retroactively change its determination and enlarge its reserve account for a prior year even though the addition may have been reasonable and allowable as a deduction if timely made.

A situation similar to that in the instant case was presented in *Rogan* v. *Commercial Discount Co.*, 149 F. 2d 585 (C.A. 9, 1945), certiorari denied 326 U.S. 764 (1945). In that case the taxpayer in one year added on its books and deducted on its return a reserve addition in the amount of nearly $50,000. Through ignorance of the law it failed to determine that an additional amount of $124,000 was a necessary and reasonable addition to the reserve account. The amount was held reasonable and would have been properly deductible had the addition been timely determined as reasonable and made on the books for that year. The taxpayer contended, as does petitioner in the instant case, that since he would have been allowed the increased deduction if the book entries were made in the previous year, and that the failure was due to ignorance of the law, he should have been allowed to correct the books to conform to the desired deduction. In disallowing the added reserve to be made, and, therefore, the added deduction, the Court of Appeals stated (pp. 587, 589) :

Whether a taxpayer is on the charge-off or the reserve method of treating bad debts, there must be an annual review of doubtful accounts receivable and an ascertainment that certain accounts are either uncollectible or that there is a reasonable probability that they are not collectible. Furthermore, *it is required that there be an entry made on the books showing such determination,* either by a charge-off or a charge to the reserve for bad debts. In the instant case, the taxpayer took an addition to its bad debt reserve of nearly $50,000 in 1934, and reported this addition to its return for that year. *It has never made on its books (so far as the record shows) or in its income tax return, any addition to its reserve for bad debts on the account of * * * [the $124,000 additional requested], or made any allowance therefor in computing the amount added to its bad debt reserve in any year. It now seeks to take a deduction * * * [for that amount by increasing the reserve account] some four years after the close of the tax year. Under the statute, regulations and what we regard as the weight of authority, this cannot properly be done.

  *    *    *    *    *    *    *

* * * Ignorance of the law does not warrant a taxpayer's failure timely to ascertain worthlessness and charge off a debt or make reasonable addition therefor in its bad debt reserve within the taxable year, as required by statutes, regulations and the authorities.
[Emphasis added.]

In the *Rogan* case, the taxpayer was bound by its determination made at the end of the taxable year involved as to what was a reasonable addition as evidenced by its reserve account on its books. This was so although it would have been entitled to a greater deduction had a larger reserve been determined to be necessary at that time. Ignorance of the law in failing to determine that a larger reserve was needed under the circumstances prevailing at the end of the year was held to be no excuse for retroactive determinations.

The facts in the *Rogan* case are even stronger for the taxpayer than those in the instant case, since the taxpayer actually needed a larger reserve, although that is not a controlling factor. Petitioner in the instant case has never contended that its reserve was inadequate, or that a mistake was made in its determination, or that there were any clerical or bookkeeping errors made on the books. The only basis for the requested increase is that it found out that it must determine the amount in order to qualify for the desired bad debt deductions. The deduction, however, must be based upon the reserve account. While petitioner could, under the law, have determined at the end of each year that its reserves should equal its net income and, on the basis of such determination, would have been entitled to a deduction of the amount so determined, it is not to be permitted, several years later and only after being challenged by respondent, to contend successfully that it should be allowed to bring up its reserves to equalize its requested deduction. Within specified limits, what is a reasonable addition to a reserve account is left initially to the discretion of taxpayers since they are initially in the best position to determine what is reasonable as applied to their own circumstances.

Petitioner's determination made at or within a reasonable time after the end of each year must be taken as binding as well as effective (subject to the limits embodied in the statute).

Petitioner contends that it should not be penalized because of mere bookkeeping entries. Whatever superficial force may be attributed to this argument, more careful consideration makes it clear that fundamentally, the significant factor is that petitioner is bound by its own determination at the end of each year as to what was a reasonable addition to a reserve account. In the instant case the entries are the only evidence we have of its determination. In situations where the bookkeeping entries do not reflect the true determination and there is merely a technical error in manifesting that intention on the books, the courts may look beyond the entries and allow the taxpayer to correct its reserve accounts. *Abraham Sultan*, 22 B.T.A. 889, 892 (1931). Cf. *Transatlantic Clock & Watch Co.*, 3 B.T.A. 1064 (1926).

In *Sultan*, the taxpayers erroneously deducted actual bad debts in addition to a reserve addition. The case arose at the time the reserve method was first allowed and there was some confusion concerning the procedure to be followed in the year of change of method. The situation in *Sultan* does not involve a redetermination by a taxpayer of a reserve account in a later year. It merely involves correcting a technical requirement, since the taxpayer's determination based upon its books as of the end of the year clearly reflected the amount it deemed necessary to deduct for bad debts.

Moreover, there is an important practical distinction between the problem involved in the *Sultan* case and the issue before us. In the instant case, petitioner, through its failure to establish a reserve in the proper amount as required by the Code, allowed that additional amount to remain in an undivided profits account. The amount was, therefore, free for use for any purpose without affording protection to the depositors in the event debts actually became worthless. Petitioner would therefore be in the position to have free access to such sums as well as to have the benefits of deductions for a bad debt reserve. There is, therefore, more than merely a bookkeeping entry involved in the instant case.

Petitioner finally relies upon an example in the regulations which allows a retroactive change in the reserve account under a certain condition. Section 39.23(k)–5(b)(3), Regs. 118, example 2, states (p. 5830):

The net income of Institution B for the taxable year 1952, computed under chapter 1 after all deductions including the deduction for dividends, but before the deduction provided in section 23(k)(1), is determined to be $250,000. Such $250,000 is credited by Institution B to the bad debt reserve as provided in section 23(k)(1) and § 39.23(k)–5(b)(3). The amount by which 12 percent of the total deposits or withdrawable accounts of Institution B at the close of

the taxable year exceeds the sum of such institution's surplus, undivided profits and reserves at the beginning of the taxable year is $500,000.

During 1954, upon examination of the return of income filed by Institution B for 1952, it is determined that the net income of such institution, properly computed, without regard to section 23(k)(1) is $275,000. Assuming that Institution B credits the additional $25,000 to its bad debt reserve, there is allowable as a deduction from gross income for such institution for the taxable year 1952, $275,000.

The example above does not, however, support petitioner's position. It does not state or give rise to the inference that retroactive changes in the reserve account are permitted in situations other than when respondent determines that the taxpayer had a greater net income for a prior year.

Petitioner contends that, if changes are allowed for one reason, they should be allowed for other reasons as well. We cannot agree inasmuch as the situations presented are clearly distinguishable. In the regulations example, a taxpayer was allowed to increase his reserve solely on the ground that his allowable reserve deduction had at a later date been increased by the respondent. The taxpayer initially manifested his intent to establish a reserve for the full amount allowable under the formula. The amount was limited by net income. When this limit was later increased, it would be manifestly unjust to deprive the taxpayer of the right to adjust his reserve and deduction to the new limit.

In the instant case there has been no adjustment by respondent of the formula determining the limits of the reserve allowable. It is true that the claim for adjustment is based upon respondent's action. This action, however, did not involve the change of a fact upon which petitioner relied. It involved a statement of the law upon which petitioner did not rely. Ignorance of the law is not a justification for failure to comply with the clear requirements of the law and is not a justification for permitting retroactive determination of prior year reserves.

From the above analysis it is apparent that the maximum bad debt deductions allowable to petitioner during the years in issue are the amounts actually determined by it and credited to a valid bad debt reserve account. It remains to be decided whether the amounts so determined were credited to bona fide bad debt reserve accounts, since respondent contends that the general loss reserve account was the only true bad debt reserve account on the books.

## Issue 2.

As stated at the end of our discussion under Issue 1, respondent contends that the general loss reserve was the only bona fide bad debt reserve on the books during the years in issue. The sole basis for

respondent's contention that the legal reserve account was not a valid bad debt reserve is that dividends were paid out of the account during each of the 3 years in issue.

Both parties agree that the names of the reserve accounts are immaterial. See *Rogers, Brown & Crocker Bros., Inc.*, 32 B.T.A. 307, 314 (1935); *Kreuger Broughton Lumber Co.*, 18 B.T.A. 1270, 1274 (1930). It is also clear that more than one bad debt reserve account may be established by one taxpayer as long as the total of the transfers to the accounts do not exceed the maximum allowable under the Code. Sec. 39.23 (k)–5 (b) (3), Regs. 118.

From the record as a whole we are satisfied that the legal reserve was not a free reserve during the years in issue but was a bona fide bad debt reserve, at least as to the amounts credited in the years in question. It is our view that the payment of dividends out of such an account does not taint transfers to it or make them nondeductible additions where the balance in such an account exceeds the credits for which deductions have been taken. On the other hand, if a taxpayer invades a bad debt reserve account for unauthorized reserve account purposes, such as the payment of dividends by the use of funds for which deductions have been taken, then to the extent that the balance is reduced to an amount less than the amounts for which deductions have been taken, the resulting deficit must be restored to gross income for tax purposes. *Arcadia Savings & Loan Association, supra; West Seattle National Bank of Seattle*, 33 T.C. 341 (1959), affd. 288 F. 2d 47 (C.A. 9, 1961). The reason for this is clear. A taxpayer may not escape taxation by placing income *otherwise taxable* in a reserve account, deduct it, and then use it for paying dividends. Such a situation, however, is not present in the instant case.

The amount of $110,000 accumulated in the legal reserve account prior to 1952 represented an appropriation of earnings and surplus while petitioner was not subject to income tax. Under such circumstances, petitioner did not receive the benefit of any deduction (tax benefit) when this amount was originally transferred to the legal reserve account, and there is no basis for subjecting it to taxation when it was distributed. By the same token, there is no basis for taxing any part of this amount if it is subsequently transferred back to the undivided profits account from whence it came. See *Arcadia Savings & Loan Association, supra*. The respondent himself has agreed with this principle in Rev. Rul. 58–126, 1958–1 C.B. 13, 14, in which it was said:

Accordingly, a transfer, in 1957, by a savings and loan association to its undivided profits of an amount from its reserve for losses that was set up from undivided profits during years prior to 1952, when such associations were not subject to Federal income tax, did not result in the production of gross income, for Federal income tax purposes. However, any transfer to its un-

divided profits account from its reserve for losses which diminishes the reserve below the aggregate amount of additions thereto after 1951 deducted for Federal income tax purposes, minus charge-offs for bad debt losses sustained after 1951 and plus recoveries on debts or portions thereof charged to the reserve after 1951, will result in the production of gross income, for Federal income tax purposes, in the amount of such diminution.

We accept this ruling as a practical implementation of the law in this area in that it fully recognizes the right of a taxpayer to transfer, with no taxable consequences, amounts out of the reserve account which equal the total accumulated prior to 1952.

In the instant case, when petitioner paid dividends during each of the years in issue (which dividends were intended by petitioner to be paid out of the $110,000 in the legal reserve account accumulated prior to 1952), the balance in the legal reserve account, after such dividends, was substantially in excess of the amounts credited to such account and deducted from income as additions to its legal reserve. This is attributable to the fact that the part of the credit to the account in the amount of $110,000 had been accumulated and credited to the reserve account before petitioner was subject to taxation. As a result, the balance in the reserve account, in each of the years in question, always exceeded the deductions taken, even though dividends were paid and charged to said account. Thus, no act or transaction occurred warranting restoration to income of any part of such dividend distributions.

Respondent places great emphasis on the Code provision which states that dividends are to be deemed to have been paid out of the most recently earned income. Sec. 115(a), I.R.C. 1939; sec. 316(a), I.R.C. 1954. He argues that the dividends in issue were paid out of the annual transfers to the reserve account and that only the net yearly transfer after deducting dividends should be an allowable bad debt deduction. While we would agree with respondent's position under some circumstances, his position is without support upon the facts of the instant case. The Code does not state that transfers from the *reserve* account are to be deemed taken from the most recent transfer to the account. Respondent gives no consideration to the existence in the reserve account of the balance of $110,000 accumulated prior to 1952, or to the fact that petitioner was not subject to Federal income tax when the $110,000 was accumulated, or that, by the same token, petitioner did not have the benefit of any deduction for such reserve accumulation.

Restoration to income of amounts credited to bad debt reserves and deducted in determining net income is a necessary and practical application of tax principles where part of the amounts deducted is used for purposes for which no deduction is properly allowable. Assuming that the deduction of a credit to a bad debt reserve was proper in

the first place (as it was in the instant case) but that later eventualities (as, for example, liquidation while there is an unused credit to bad debt reserves) free the amount deducted from the circumstances and conditions originally justifying it, the only sound and practical approach is to restore the credit balance to income, thus preventing an escape from taxation of an item which in fact reflects income.

In the instant case, however, the situation is quite different. Here, the payment of dividends never reduced the legal reserve account to an amount less than the post-1951 credits to that account. This, of course, was due to the fact that the account included the pre-1951 accumulation credited when petitioner was not subject to tax, for which petitioner took no deduction. Since the balance in the account exceeded post-1951 credits, petitioner is not in a position of having received a deduction or deductions for credits used in the years in question for a purpose for which a deduction was not allowable. It follows that there is no basis for a synthetic determination of income to offset a nonallowable use.

The full amounts transferred to the legal reserve account for 1953 through 1955 are therefore deductible.

*Issue 3.*

The final question presented is whether the amounts transferred to the reserve for contingencies in 1955 are deductible as a valid addition to a reserve for bad debt reserve account. The reserve for contingencies account was established with a transfer to it in the amount of $35,629.78 on December 31, 1955, the last day of the period in issue. Petitioner has completely failed to introduce any evidence establishing that the account was, in 1955, even intended to be a reserve for bad debts. The transfers to this account may, therefore, not be deducted.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MURDOCK, *J.*,[1] dissenting: Clearly the petitioner had $110,000 in a reserve which it could distribute to its stockholders by specific action without affecting its right to deductions for additions to its reserve for bad debts, but the report assumes, without proof, that the distributions in question were made from that $110,000. It has a finding that the corporation intended the dividends to be paid from the $110,000 but what does this mean?

Section 115(b) expressly provides that every distribution is made out of earnings or profits to the extent thereof, and from the most

---

[1] This dissent was prepared during Judge Murdock's incumbency.

recently accumulated earnings or profits and thereafter exempt earnings may be distributed. See also section 316(a) of the 1954 Code. The petitioner actually made distributions of dividends in the taxable years and they are deemed to have been made out of most recently accumulated earnings. It therefore seems wrong to me to hold that they have been paid out of the $110,000. The petitioner is claiming deductions for additions to the reserve from current earnings. The amount of current earnings credited to the reserves in each taxable year has been offset by a charge to dividends. It would seem to me that only the net difference between the new credit and the charge, if any, remaining in the reserve account, can be regarded as actually an amount of current earnings placed in the reserve and deductible. It cannot be assumed that the charges in these accounts reduced the $110,000.