**NEWPORT FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. B–65–C–16.

United States District Court
E. D. Arkansas, N. D.

Oct. 3, 1966.

Xaneaster Hodges, Newport, Ark., for plaintiff.

Robert D. Smith, Jr., U. S. Atty., Eastern District of Arkansas, Little Rock, Ark., Robert L. Waters, Atty., Tax Division, Dept. of Justice, Fort Worth, Tex., for defendant.

### Memorandum Opinion

HENLEY, Chief Judge.

This is a suit brought against the United States by Newport Federal Savings & Loan Association for the purpose of securing a refund of income tax, negligence penalty and interest, paid by it following a deficiency assessment made by the Commissioner of Internal Revenue with respect to calendar year 1960. The cause is now before the Court on the cross motions of the parties for summary judgment.

Plaintiff is a mutual savings and loan association which has been doing business in Newport, Jackson County, Arkansas, since 1934. Its deposits are insured by the Federal Savings & Loan Deposit Corporation; it is subject to the regulatory powers of the Federal Home Loan Bank Administration and is within the jurisdiction of the Little Rock Branch of the Federal Home Loan Bank. Under applicable regulations it is required to maintain an adequate "federal insurance reserve," for the purpose of protecting the interests of depositors in relation to losses generally, including bad debt losses. Bellefontaine Federal Savings & Loan Association v. C.I.R., 33 T.C. 808, 813.

Plaintiff has been subject to federal income taxation since 1951. Under the provisions of section 591 of the Internal Revenue Code of 1954 dividends paid to depositors are deductible from corporate gross income for income tax purposes. And under the provisions of section 593 of the Code plaintiff is also entitled to deduct annual credits to bad debt reserves. The Treasury Regulations on Income Tax, section 1–593.1(c), provide that credits to reserves required by federal or State statutes or regulations shall be deemed credits to bad debt reserves.

From 1952 through 1959 plaintiff had no income tax liability, since its undivided profits remaining after the payment of dividends were regularly credited to the federal insurance reserve.

Plaintiff keeps its books on a calendar year basis and for dividend purposes closes its books twice each year, once at the end of June and once at the end of December.

Plaintiff's insurance reserve as of the beginning of 1960 was $133,094.48. It also had a reserve account entitled "Con-

tingencies For Losses." That reserve was not a bad debt reserve; it had been accumulated during years prior to 1952, with respect to which years plaintiff was not subject to income taxation. As of June 30, 1960, the balance in that reserve was $15,197.41.

Net earnings for the first half of 1960 amounted to $14,293.41 after payment of dividends. This controversy had its genesis when plaintiff's board of directors determined, erroneously as it turned out, that if the insurance reserve was credited with the first half year's net earnings, and if the "Contingencies For Losses" account was closed out and the balance therein transferred to the insurance reserve account, net earnings after dividends for the second half of the year could be credited to "Undivided Profits," a surplus account. On June 28, 1960, a resolution was adopted which rescinded an earlier resolution which had earmarked undivided profits after dividends for the insurance reserve account. By proper bookkeeping entries the insurance reserve was credited with the $14,293.41 in net earnings through June and with the $15,197.41 balance in the "Contingencies For Losses" account. Those credits raised the insurance reserve account to $162,585.30.

Net earnings after dividends for the second half of 1960 amounted to $17,981.79, and on December 30, 1960, when the books were closed, that amount was credited to undivided profits.

In the meantime the affairs of plaintiff had been audited by the Division of Supervision of the Federal Home Loan Bank Board, and a copy of the audit was transmitted to plaintiff by the Home Loan Bank of Little Rock under date of January 12, 1961. Between that date and March 8, 1961, the Little Rock Bank received a letter from the Division of Supervision to the effect that the June 1960 resolution of plaintiff's board authorizing the credit of second half-year earnings to undivided profits was ineffective because " 'no amount of earmarked undivided profits was then eligible for release.' " The Little Rock Bank was requested to advise plaintiff of that determination.

That advice was given plaintiff by the Little Rock Bank on March 8, and plaintiff was requested in replying to the January 12 letter to "give consideration to the foregoing comments of the Division of Supervision." By letter dated April 10, 1961, plaintiff advised the Little Rock Bank that "appropriate action had been ordered for the minutes to show the voiding of the previous resolution."

Plaintiff's tax return was filed on April 15, and it reflected that bad debt reserves had been credited with $32,275.20. That amount, which represented plaintiff's total annual net income after dividends, was deducted with the result that there was no tax liability reported, and no tax was paid.

That return did not correctly reflect what was shown on the taxpayer's books because, as of that date, the second half-year's earnings had not been credited to any reserve for bad debts and were still being carried on the books as surplus.

Although plaintiff had been advised in March of the comments of the regulatory agency with respect to the resolution of June 28, 1960, and although plaintiff had advised the Little Rock Bank on April 10 that appropriate action had been ordered to void that resolution, the record does not indicate that anything was in fact done until June 27, 1961.

On that date the board resolved to transfer the $17,981.79 being carried in the undivided profits account to the insurance reserve account to the extent of $1,631.62 and to a new reserve account entitled "Reserve For Bad Debts, Reserve For Contingencies" to the extent of $16,350.17 thus placing all of the net earnings for the second half of 1960 into reserve accounts. It was further decided that this action should be deemed effective as of December 31, 1960, and the officers were directed to make appropriate book entries as of the date last mentioned. The entries were made on or about June 30, 1961.

Finally, on December 19, 1961, plaintiff's board adopted a resolution formally rescinding the resolution of June 28, 1960, which had caused the trouble in the first place.

In due course, plaintiff's 1960 return was audited by the Internal Revenue Service, and it was determined that the ultimate credit to the federal insurance reserve and the newly set up bad debt reserve account of plaintiff's net earnings after dividends for 1960 had not been made within the taxable year or "as soon as practicable" after the close of that year, as required by I.T. Regulations, § 1–593.1(c). Based on that determination the Commissioner of Internal Revenue disallowed the deduction of the net earnings for the second half of 1960 and assessed an appropriate deficiency. The Commissioner also assessed a negligence penalty based on the fact that the return should have been filed not later than March 15, 1961, and was not filed until April 15 of that year.

Basically, plaintiff seeks to recover the full amount of the deficiency assessed and paid, including the negligence penalty. Ignoring the negligence penalty for the present, the theory of the plaintiff is that the ultimate credits of the net earnings of $17,981.79 to the reserve accounts, while not made within the taxable year 1960 were made "as soon as practicable" after the end of year and were deductible under the statute and regulations.

Alternatively, plaintiff says that if it was not entitled to deduct the $17,981.-79 primarily in controversy, it is entitled to offset against that sum the balance of $15,197.41 in the old "Contingencies For Losses" account which was transferred to the insurance reserve account during the taxable year. To allow such an offset would, of course, substantially reduce the tax liability of plaintiff.

Finally, plaintiff says that in any event it was required under the regulations of the Federal Home Loan Bank Administration to credit the insurance reserve at the end of 1960 with the sum of $1,631.62, and that it should be considered that the credit actually made in 1961 was in legal contemplation made at the close of 1960.

The defendant denies that any of those contentions has merit.

While both sides have moved for summary judgment, plaintiff's motion is limited to the claim of an offset of $15,-197.41 against the earnings of $17,981.-79.

 It is familiar law that summary disposition of a case is not warranted merely because both sides move for summary judgment, although each movant by filing his motion concedes that as far as that motion is concerned no genuine issue as to a material fact exists. And the Court is well aware of the long line of Eighth Circuit cases which emphasize that summary judgment is to be granted only in the clearest cases and only where the Court is adequately convinced that there is an absence of any genuine and material factual issue. See Kennedy v. Bennett, 8 Cir., 261 F.2d 20, and cases there cited. On the other hand, if a movant's case is so clear that the Court is fully persuaded that upon a trial it would be required to direct a verdict in movant's favor, summary judgment is appropriate. Hurd v. Sheffield Steel Corporation, 8 Cir., 181 F.2d 269; Poole v. Gillison, E.D.Ark., 15 F.R.D. 194; 6 Moore's Federal Practice, 2d ed., p. 2128.

The problem in this case is essentially the same as that before the Tax Court in Rio Grande Building & Loan Association v. C.I.R., 36 T.C. 657, and Colorado County Federal Savings & Loan Association v. C.I.R., 36 T.C. 1167, aff'd per curiam, 5 Cir., 309 F.2d 751. In both of those cases, as here, tax returns filed by the Associations indicated an intent to credit to bad debt reserves net earnings after dividends for the taxable years involved, but in both of those cases, as here, the reserve accounts were not actually credited with the net earnings until a substan-

tial period of time after the filing of the returns.[1]

In support of its motion the counsel for the Government contends that under the regulation which has been mentioned, the validity of which is not challenged, a Federal Savings and Loan Association if it desires to deduct from net income a credit to a bad debt reserve account must make the necessary determination and the actual book entries in the course of the closing of its books for the tax year. Counsel recognizes that the closing of the books may, and frequently does, take place after the close of the taxable year, but contends that for income tax purposes the necessary credits to the reserve accounts must be made not later than the date on which the Association files or is required to file its tax return. And counsel argues on the strength of the two decisions above cited that where the credit is actually made after the tax return is prepared and filed, it is too late as a matter of law, and that the claimed deduction is not allowable.

Plaintiff contends on the other hand that the Tax Court has not set or purported to set the date for the filing of the corporate tax return as an automatic cut off date for the crediting of the reserve accounts, and that it is ultimately a question of fact whether the reserve accounts have been credited "as soon as practicable" after the end of the taxable year.

In *Rio Grande,* supra, the Tax Court said (p. 664 of 36 T.C.):

"The regulations thus recognize variations in general accounting procedures and, we believe, correctly do not establish an absolute time limit by which the entries must be made on the books. Ordinary business practices necessitate the allowance of a reasonable time after the close of the year for the auditing of the books, the physical notation of the closing entries to profit and loss, and the adjusting entries, including the entries to the various reserve accounts. While we do not intend to establish such a time limit, generally the limit should be not later than the time at which the taxpayer files its income tax return for the year involved. At that time, it is in a position to ascertain what would be a reasonable amount to add to the reserve account, and can determine what the net income is if it is a factor limiting the amount of the allowable reserve deduction."

Regardless of whether the Tax Court decisions establish a rule that a Savings and Loan Association automatically has until the date of the filing of its return to credit its bad debt reserve with net earnings after dividends, the Court considers that in general the period between the end of the taxable year and the date of the filing of the return some months later is a reasonable and indeed a liberal period within which the Association may determine whether and to what extent the reserves are to be increased. And the Court believes that only in exceptional cases should a deduction for such a credit be allowed where the credit is not reflected on the corporate books until after the return is filed or required to be filed. The Court is convinced that this is not an exceptional case.

Affidavits of plaintiff's vice president and of its secretary-treasurer are to the effect that the closing of the books as of December 30, 1960, and the crediting of the net earnings after dividends to undivided profits were tentative and subject to adjustment and audit, and that the affairs of the corporation, at least as far as bad debt reserves were concerned, were in a state of flux until June 28, 1961, when it was decided to take the net earnings for the second half of 1960 out of undivided profits and put them into the reserve accounts.

---

1. In both *Rio Grande* and *Colorado* the period of time which elapsed between the filing of the return and the actual crediting of the reserve was much longer than that involved here, but the Court does not deem that factor to be of controlling importance.

It may very well be true that immediately after the close of 1960 the affairs of the Association were subject to audit and that its books were subject to adjustment. But, as has been shown, the tax return that was filed in April indicates that a determination had been made to deduct the net earnings in question as credits to bad debt reserves, and there is no reason whatever why the reserve accounts could not have been credited with the earnings as of the date of the preparation and filing of the return. More than this, as early as March 1961, plaintiff had been notified that the June 28, 1960, resolution of its board of directors was improper, and as early as April 10 had advised the Little Rock Bank that the resolution would be rescinded.

■■ It is well established that tax deductions are matters of legislative grace, and that a taxpayer desiring to take a deduction must comply with statutory and regulatory requirements related thereto. Plaintiff was charged with knowledge of the requirement of the Regulations that the credit to bad debt reserve must be made within the taxable year or as soon as practicable thereafter; it also knew by April 15 at the latest that it was going to claim a deduction based on a credit to bad debt reserve of the net earnings for the second half of 1960. There was simply no valid reason for the credit not to have been entered then, rather than more than two months later. That it may not have been convenient to plaintiff to make the necessary entries until it closed its books for the first half of 1961 does not appear to the Court to be a legal excuse for plaintiff's failure to make the entries at or before the time it filed its return.

There is no reason to believe that plaintiff's evidence upon a trial would be substantially different or stronger than what is now before the Court, and on the basis of the record before it the Court would be impelled to direct a verdict against the plaintiff on the particular issue just discussed.

■ Turning now to the question of whether plaintiff is entitled to an offset against net earnings of the credit to the insurance reserve from the old "Contingencies For Losses" account, which transfer, as has been pointed out, was in fact effected in 1960, it has been shown that the old reserve had been accumulated prior to 1952, and the Court will assume that it was accumulated out of net earnings in taxable years prior to 1952. Earnings for such years were exempt from taxation.

The transfer of the balance in the old reserve account to the insurance reserve account was not made for income tax purposes but rather to satisfy what were supposed to be the reserve requirements of the regulatory agency; plaintiff did not claim that transfer as a bad debt deduction on its 1960 return. However, in its claim for refund, which was denied by the Government, plaintiff advanced the offset contention which it advances here.

Plaintiff contends that the offset should be allowed; the Government asserts the contrary. Neither side cites any authority in support of its position.

At the outset of discussion of this issue the Court notes that the Government does not contend that there is any procedural impediment to the allowance of the offset if plaintiff is entitled to it from a substantive standpoint; nor does the Government argue that the addition of $15,197.41 would have been an unreasonable addition to plaintiff's bad debt reserve as far as amount is concerned. The sole position of the Government is that the offset should not be allowed because the old "Contingencies For Losses" account which was closed into the insurance reserve in 1960 was established or accumulated during years with respect to which plaintiff was entirely exempt from income taxation. Counsel for the Government says in his brief: "* * * Congress could not be supposed to have intended that amounts accumulated for the many years prior to 1952, when the associations were tax-exempt, could be utilized after repeal of the exemption to diminish a tax liability otherwise owed by the simple expedient

of transferring such accrued amounts to a different account." The Court does not accept that argument.

All businesses, including Federal Savings and Loan Associations and banks, which extend credit suffer bad debt losses from time to time; such losses are part of the cost of doing business and are deductible for income tax purposes. From an accounting standpoint, a bad debt loss may be charged off when it occurs, or losses from bad debts may be anticipated by periodic credits to a reserve for bad debts account.

As far as federal income tax is concerned, the subject of bad debts is governed generally by section 166 of the Internal Revenue Code. Section 166(a)(1) provides that there shall be allowed as a specific deduction "any debt which becomes worthless within the taxable year." Section 166(c), however, permits a taxpayer, as an alternative to the method of handling bad debts permitted by section 166(a)(1), to deduct, in the discretion of the Treasury, "a reasonable addition to a reserve for bad debts."

When Federal Savings and Loan Associations became subject to federal income tax in 1951, they were accorded rather liberal treatment as far as bad debts were concerned. Section 593 of the Internal Revenue Code of 1954, which governs here and which appears to have been a substantial reenactment of section 313(e) of the Revenue Act of 1951, provided:

"In the case of a mutual savings bank not having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts under section 166(c) shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of—

(1) the amount of its taxable income for the taxable year, computed without regard to this section, or

(2) the amount by which 12 percent of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year."

Although the 1951 Revenue Act repealed the total exemption of Savings and Loan Associations from income taxation, it is pointed out in 5 Merten's, Law of Federal Income Taxation, Zimet & Ness Revision, § 30.78a, pp. 161–162, that the reserve provisions of section 593 of the 1954 Code "largely left those institutions exempt from Federal income tax as a practical matter," until section 593 was amended drastically by the Revenue Act of 1962.

In appraising the contentions of the parties relative to the claimed offset, it is important to keep in mind that a reserve for bad debts is neither an asset nor a liability; it is merely a book entry. 5 Merten's, op. cit., § 30.69, p. 133. The amount of the entry for a given year is, or should be, determined in general by reference to the amount of receivables coming onto the Association's books during the taxable year.

Subject to statutory limitations, it is the credit entry to the reserve for bad debt account which is allowed as a deduction on an Association's income tax return. Of course, as a matter of accounting the credit entry to the reserve account must be offset by a debit to some other account. Normally, the account debited will be called "Bad Debt Expense," and will be closed into the profit and loss account. But, the Court sees no objection from either an accounting or from an income tax standpoint

to the credit to the reserve account being offset by a debit to a surplus account or to a reserve account originally set up for contingencies other than bad debt losses. And it does not appear to the Court to be material that the debited surplus account or non-bad debt reserve account may represent surplus or reserve established or accumulated prior to 1952.

As far as the intent of Congress in adopting what became section 593 is concerned, Congress certainly knew that Federal Savings and Loan Associations had been tax exempt theretofore and that they had built up surp'uses and had in instances set up non-bad debt reserves. If Congress had intended to prohibit transfers from such prior surpluses or reserves to bad debt reserves for income tax purposes, it could have said so easily. But no prohibitory language appears in the statute, and the Court has found none in the pertinent regulations.

■ The Court next takes up the claim of plaintiff that it is entitled to deduct the specific sum of $1,631.62 which the Home Loan Bank Administration in 1961 required to be credited to the insurance reserve account. Plaintiff's argument is that since it was required to make that specific credit in 1960 and did not do so, this Court should "regard as done what should have been done," and should consider that the actual credit entered in 1961 as having been made in 1960.

The argument is not without appeal, but the Court feels that it must be rejected.

The $1,631.62 in question was included in the $17,981.79 originally credited to undivided profits and was later transferred to the insurance reserve account proper. The Court will assume without deciding that this transfer, taking place in 1961, was required by the regulations of the Home Loan Bank Board, that the insurance reserve should have been credited with that sum in 1960, and that said sum should never have been credited to excess profits.

Unfortunately for plaintiff, its right to deduct the ultimate credit to the insurance reserve account from its gross income for 1960 is not to be measured by the requirements of the regulatory agency but by the Internal Revenue Code and regulations issued thereunder. That principle is well established. Old Colony Railroad Co. v. C. I. R., 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484; Kansas City Southern Ry. Co. v. C. I. R., 8 Cir., 52 F.2d 372; South Side Building and Loan Association v. Hooks, District Director of Internal Revenue, N.D.Ohio, 188 F. Supp. 652; Bellefontaine Federal Savings & Loan Association v. C. I. R., supra.

As has been seen, section 593 of the I. R. C. would have permitted the deduction of the $1,631.62 credited ultimately to the insurance reserve had the credit been timely reflected on the corporate books, but the regulations required the credit to be made within the taxable year 1960, or as soon as practicable after the end of that year, and the Court has already held as a matter of law that the 1961 credits to the insurance reserve account and to the reserve for bad debts and contingencies account were not timely made. The Court thinks that it would go in the face of the regulations to say that a credit to the insurance reserve made in the middle of 1961 should be considered as having been made six months earlier simply because from a regulatory standpoint it should have been made at that time.

■ There remains for consideration the matter of the negligence penalty. Although the amount of that penalty was included in the claim for refund, the claim does not discuss the penalty or offer any excuse or explanation with respect to the late filing of the return. No excuse or explanation has been offered here. As Rule 56 of the Federal Rules of Civil Procedure is now written, a party confronted with a motion for summary judgment may not simply stand on his pleadings; he is required to come forward with more substantial material in opposition to the motion.

■ The Court holds, therefore, that plaintiff is liable for the penalty. How-

ever, it is obvious that the allowance of the offset of $15,197.41 against the net earnings of $17,981.79 will result in a net disallowance of claimed deductions of only $2,784.38 so that plaintiff's tax deficiency will be much reduced; the penalty will be reduced correspondingly.

The Court's ultimate conclusion is that the plaintiff is entitled to a refund based upon the allowance of the offset of $15,-197.41. The Court does not know what the amount of the refund will be. Counsel for the Government is requested to make the necessary calculations and to prepare and submit a precedent for judgment after obtaining the approval of opposing counsel as to form and computation. It is understood that in complying with that request the Government is not conceding the correctness of the Court's decision that the offset should be allowed.