ANNAPOLIS FEDERAL SAVINGS AND LOAN ASSOCIATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Annapolis Federal Sav. & Loan Asso. v. Commissioner
Docket No. 4100-70
United States Tax Court
T.C. Memo 1972-243; 1972 Tax Ct. Memo LEXIS 14; 31 T.C.M. (CCH) 1206; T.C.M. (RIA) 72243; December 6, 1972, Filed D. L. Mitchell and Thomas A. O'Neil, for the petitioner. Randolph D. Mason, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION @HALL, Judge: Respondent determined a deficiency in petitioner's 1967 Federal income tax in the amount of $23,844.07. Petitioner claimed a $169,334 net operating loss deduction in its corporate income tax return for the calendar year 1967. Respondent disallowed $115,113 of the deduction, representing deductions claimed for additions to a bad debt reserve for the calendar years 1964, 1965 and 1966 of an acquired corporation, Fidelity Savings and Loan Association (hereinafter "Fidelity"). If Fidelity is entitled to deduct these amounts for the calendar years 1964, 1965 and 1966, petitioner is entitled to the claimed net operating loss. FINDINGS OF FACT All the facts have been stipulated and the stipulation and exhibits attached thereto are incorporated by this reference. Petitioner, Annapolis Federal Savings & Loan Association, is a domestic building and *16 loan association within the meaning of section 593, [1]with its principal place of business in Annapolis, Maryland. It timely filed its Federal income tax return for the calendar year 1967 with the district director of internal revenue, Baltimore, Maryland, on which it claimed a $169,334 net operating loss deduction attributable to Fidelity, computed as follows: Taxable year ended:
December 31, 1963
$ 13,301
December 31, 1964
83,525
December 31, 1965
31,785
December 31, 1966
39,303
March 31, 1967 1,420 $169,334
Respondent issued to petitioner a statutory notice of deficiency for 1967 [2] which respondent disallowed that portion of Fidelity's net operating loss claimed by petitioner attributable to the bad debt deductions claimed by Fidelity, computed as follows: Net Operating
Less Unallow-
Corrected Net
Taxable
Loss for Tax-
able bad-debt
Operating Loss
Year Ended
able Year
deduction
for taxable year
12/31/63
$ 13,301
$0
$ 13,301
12/31/64
83,525
(71,684)
11,841
12/31/65
31,785
(25,242)
6,543
12/31/66
39,303
(18,187)
21,116
3/31/67
1,402
0
1,402
1967 Math Error 18
(18)
0
TOTAL $169,334
(115,131)
$ 54,203
*17 Fidelity, also a domestic building and loan association within the meaning of section 593, was chartered on December 1, 1963, by the Federal Home Loan Bank Board, and made its first real estate loan during 1964. Its principal place of business was Oxon Hill, Maryland. In October 1966 a supervisory agent for the Federal Home Loan Bank Board wrote a letter to the directors of Fidelity, enclosing a report of the Board's examination *18 of Fidelity, in which he pointed out to the directors the examiner's comments on policies and practices of Fidelity which adversely affected its financial condition. The letter states in part: We also direct your attention to the following: 1. Despite assurance to the contrary loans were granted when the association's liquidity was less than the required minimum. 2. Money borrowed from sources other than the Federal Home Loan Bank exceeds the maximum permitted by Section 563.8 of the Insurance Regulations. 3. Loan 37, granted during a previous review period, remains in violation of the lending limitations. 4. Policies and procedures relative to the method of appraising should be reviewed and the necessary changes made that will assure realistic appraised values. Information on the reports should be sufficiently detailed to substantiate the value assigned and also reflect the basis for determining land values. It is our opinion that the compensation of appraisers should not be contingent upon the approval of the loan. 5. Minutes of meetings should be completed and properly signed within a reasonable period subsequent to each meeting. The number of regulatory violations *19 shown in the report indicates that the persons responsible are either not familiar with the regulations or are unwilling to abide by them. * * * The indifference shown to regulations and to the day-to-day operations of the association by the directors and management is appalling. Fidelity solved its problems by merging into petitioner on March 31, 1967, pursuant to a merger agreement dated January 4, 1967. Fidelity timely filed original Federal income tax returns with the district director of internal revenue, Baltimore, Maryland, for the taxable years ended December 31, 1963, 1964, 1965 and 1966, and for the short period ended March 31, 1967. Each return disclosed a net operating loss. In none of these returns did Fidelity claim a bad debt deduction, nor did Fidelity make any statement electing the reserve method of accounting for bad debts. Fidelity never established a bad debt reserve on its books for any year. Petitioner filed amended returns on behalf of Fidelity on October 15, 1968, for the calendar year 1964, and on November 5, 1968, for the calendar years 1965 and 1966, in which petitioner on behalf of Fidelity claimed bad debt deductions (representing additions *20 to a bad debt reserve) of $71,684, $25,242 and $18,187, respectively, or a total of $115,113. On June 14, 1968, petitioner credited the $115,113 in a single journal entry to petitioner's existing reserve for losses on qualifying real property loans on the merged books of Fidelity and petitioner. Petitioner did not attempt to reopen the original books of Fidelity for the calendar years 1964, 1965 and 1966 for the purpose of setting up a reserve for losses on qualifying real property loans or any other bad debt reserve. OPINION Section 166(c) provides that a taxpayer may deduct a reasonable addition to a reserve for bad debts in lieu of a deduction under section 166(a) for specific debts which have become wholly or partially worthless within the taxable year. In the case of a domestic building and loan association within the meaning of section 593(a), the specific requirements for deductions allowable under section 166(c) are set out in subsections 593(b) through (f). Section 593(c)(1) requires that such a domestic building and loan association "which uses the reserve method of accounting for bad debts shall establish and maintain a reserve for losses on qualifying real property *21 loans * * *." In addition, the regulations require that additions to the reserve "must be credited" to the reserve "by the close of the taxable year, or as soon as practicable thereafter." Section 1.593-5(b)(1), Income Tax Regulations.
Use of the reserve method of accounting for bad debts is a privilege which allows a taxpayer a deduction for bad debts in advance of the debts becoming worthless. "Where the Congress has authorized certain tax privileges and has prescribed the conditions to be met in qualifying for them it has been held that strict compliance with the statute is necessary * * *." Commercial Savings & Loan Association, 53 T.C. 14, 20 (1969). A taxpayer seeking to use the reserve method of accounting for bad debts prescribed in section 593 must also comply with regulation section 1.593-5(b)(1) which requires that amounts be credited to reserves by the close of the taxable year, or as soon thereafter as practicable. "The regulation is a reasonable interpretation of the statute." Commercial Savings & Loan Association, supra at 20; Rio Grande Building and Loan Association, 36 T.C. 657, 663 (1961). Respondent argues that Fidelity *22 has failed to comply with the statute and regulation in that it failed to establish and maintain reserves on its books of account, and credit additions to such reserves by the close of the taxable years 1964, 1965 and 1966, or as soon as practicable thereafter. We agree with respondent. The claiming of deductions for bad debt losses on Fidelity's amended returns for the years 1964, 1965 and 1966 does not meet the bookkeeping reouirements of section 593 that a domestic savings and loan association must establish and maintain a reserve on its books of account and credit additions thereto. Colorado County Federal Savings & Loan Association, 36 T.C. 1167 (1961), affirmed per curiam 309 F. 2d 751 (C.A. 5, 1962); Leesburg Federal Savings & Loan Association, 55 T.C. 378 (1970). The crediting of a lump sum (representing reserves for Fidelity for the years 1964, 1965 and 1966) in a single journal entry to petitioner's existing reserve for losses on the merged books of Fidelity and petitioner in June 1968 also does not meet these bookkeeping requirements. Fidelity's books for 1964, 1965 and 1966 were closed without reserves having been established; the *23 entry for the year 1967 on the successor's books did not constitute the establishment of a reserve by Fidelity. It is clear that a book entry made after the termination of Fidelity's separate existence fell short of meeting the requirement that Fidelity establish a reserve. "The bookkeeping requirements set out by the Code and by the regulations are intended to insure that the deduction is taken only for actual additions to genuine bad debt reserves.* * * The Commissioner is charged with allowing the deduction for additions to bad debt reserves only where such reserves, in fact, exist. If the reserves have never been set up * * * then the deduction cannot be allowed." Leesburg Federal Savings & Loan Association, supra at 386-387. Fidelity failed not only to establish reserves on its books, but also to credit additions thereto as soon as practicable after the close of its taxable years 1964, 1965 and 1966. This Court when considering the meaning of the phrase "by the close of the taxable year, or as soon as practicable thereafter" said in Rio Grande Building and Loan Association, supra at 664: The regulations thus recognize variations in general accounting *24 procedures and, we believe, correctly do not establish an absolute time limit by which the entries must be made on the books. Ordinary business practices necessitate the allowance of a reasonable time after the close of the year for the auditing of the books, the physical notation of the closing entries to profit and loss and the adjusting entries including the entries to the various reserve accounts While we do not intend to establish such a time limit, generally the limit should be not later than the time at which the taxpayer files its income tax return for the year involved. At that time, it is in a position to ascertain what would be a reasonable amount to add to the reserve account, and can determine what the net income is if it is a factor limiting the amount of the allowable reserve deduction. The Internal Revenue Service recognizes that the phrase "as soon as practicable thereafter" allows some flexibility in making the necessary book adjustments after the close of the taxable year. In Rev. Rul. 68-410, 1968-2 C.B. 256, the Service ruled that a taxpayer had credited amounts to its reserves as soon as practicable, although it was more than eight months after *25 the close of its taxable year, but only seven days after its income tax return was timely filed. The taxpayer was able to show that it could not obtain the data earlier, and once the data was obtained, it was recorded without delay in the books of account. See Peoples Federal Savings & Loan Association v. United States, 320 F. Supp. 179 (D.S.C., 1970) (taxpayer's crediting of additions to the reserve 4-1/2 months after filing its return was as soon as practicable due to accountant's illness and the pressure of his business). However, when no valid reason is shown for extending the time beyond the filing of the return, the courts have strictly construed this provision of the regulations. See Weqport Federal Savings & Loan Association v. United States, 259 F. Supp. 82 (E.D. Ark., 1966) (taxpayer's failure to credit additions to reserve until 2-1/2 months after filing return did not comply with regulation); Colorado County Federal Savings & Loan Association, supra (taxpayer's crediting of addition to reserves 2-1/2 and 1-1/2 years after end of taxable years in issue likewise did not comply with the regulations). Petitioner asserts in his brief *26 that Fidelity "either as a result of acts of misfeasances or nonfeasances" failed to make additions to a reserve for losses, and "it is reasonable to assume that such an allowance should have been made in the original returns as filed." These assertions are not well founded. The only benefit Fidelity would have obtained from such deductions would have been an increase in its net operating loss carryover. Petitioner has failed to prove reasonable cause here for extending the time for crediting additions to a reserve beyond the time of the filing of Fidelity's original returns. Petitioner also contends that section 1.593-5(b)(2), Income Tax Regulations, providing for subsequent adjustments to amounts credited to the reserve for losses, permits the establishment of a reserve by means of filing an amended return where such reserve has not been timely established. Respondent argues that there is no logical basis for this conclusion and that the regulation merely provides for certain special exceptions that are not applicable here. Again we agree with respondent. This Court considered this question in Ohio Pike Savings & Loan Co., 55 T.C. 388 (1970), in which we held that *27 where the original deduction for addition to the reserves was fatally defective because of failure to timely make the required book entries, the petitioner was not entitled to a deduction for "subsequent adjustments." The Court's reasoning was as follows (55 T.C. at 393): The underlying assumption of section 1.593-5(b)(2) is that there was initially a valid addition to the reserves and that a subsequent adjustment in the taxpayer's taxable income may permit or require that there be a corresponding increase or decrease in the amount of that addition. It was clearly never the purpose of the regulations to permit a taxpayer to pull itself up by its bootstraps and obtain a deduction for an addition to its reserves where there has been a fatal failure to comply with the accounting requirements of the statute and regulations in the first place. The language of the regulations is clear enough: It provides that where an adjustment has the effect of permitting an increase or requiring a reduction in the amount claimed on the return as an addition to the reserve, "then the amount initially credited to such reserve for such year pursuant to subparagraph (1) of this paragraph may *28 have to be increased or decreased, as the case may be, to the extent necessary to reflect such adjustment." (Emphasis supplied.) Obviously, the words "initially credited" contemplate that the amounts were properly credited in the first instance; and unless an addition to the reserve has been properly credited, there is no basis upon which to compute an upward revision of such addition. Our case is easier. Fidelity did not even claim a deduction for additions to a bad debt reserve on its original returns, much less make the required entries in its books of account. The regulation on which petitioner relies provides only for subsequent adjustments to preexisting amounts validly claimed on a timely return and properly reflected on the books of account. We can find therein no authority for petitioner to make "additions" to Fidelity's non-existent reserves, and no redemption for Fidelity's failure to comply with the clear prerequisites for the deductions belatedly claimed herein. Accordingly, we hold that petitioner is not entitled to that portion of Fidelity's net operating loss carryover attributable to the bad debt deductions claimed in Fidelity's amended returns for the calendar *29 years 1964, 1965 and 1966. Decision will be entered under Rule 50 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Additional issues raised in the statutory notice and petition have been settled by stipulation of the parties, as follows: (a) Petitioner concedes that $7,680 claimed as expenses for "repairs" represents capital expenditures. (b) In the statutory notice respondent disallowed the deduction for alleged repairs of $4,285.76 representing "plumbing costs and septic system" with respect to four properties acquired through foreclosure. Petitioner concedes that these expenditures constitute capital improvements made after the acquisition of those properties, and petitioner and respondent agree that the life of these improvements is seven years and that petitioner is entitled to straight-line depreciation computed from July 1, 1967, with respect thereto.↩