385 F.3d 236
 Anna GUALANDI and Claudia Travers, Plaintiffs-Appellants,
v.
Gloria ADAMS, J.J. Newman Co., Inc., John Newman, also known as Jack Newman, U.S.I. Administrators, U.S.I. Insurance Corp., Donald Hanft, Bruce Lavalle, Cornelius Mahoney, Bruce Meirowitz, Shoreham-Wading River Teachers Association and Jeffrey Wasserman, Defendants-Cross-Claimants-Cross-Defendants-Appellees.
 No. 02-7809.
 United States Court of Appeals, Second Circuit.
 Argued May 5, 2004.
 Decided October 1, 2004.
 
 Appeal from the United States District Court for the Eastern District of New York, Jacob Mishler, J. COPYRIGHT MATERIAL OMITTED Edward R. Hopkins, Smithtown, NY, for Plaintiffs-Appellants.
 Hanan B. Kolko, Meyer, Suozzi, English & Klein, P.C., New York, NY, for Defendants-Appellees Donald Hanft, Bruce Lavalle, Cornelius Mahoney, Bruce Meirowitz, Shoreham-Wading River Teachers Association and Jeffrey Wasserman.
 Andrew Crabtree, Melville, NY (Thomas Schulz, Schulz and Associates, Melville, New York, of counsel), for Defendants-Appellees Gloria Adams, J.J. Newman Co., Inc., John Newman, a/k/a Jack Newman, U.S.I. Administrators and U.S.I. Insurance Corp.
 Before: CARDAMONE, JACOBS, and B.D. PARKER, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 Plaintiffs appeal from an order entered on June 21, 2002 in the United States District Court for the Eastern District of New York (Mishler, J.) that dismissed their ERISA complaint against defendants. We have to resolve on this appeal a dispute between plaintiffs public school teachers and the defendant labor union to which they belong, as well as various other defendants associated with their employee benefit plan. The issue before us is whether the employee benefit plan — which defendants set up and administered using funds from the public school district in which plaintiffs were employed — was subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 26 U.S.C. and 29 U.S.C.). Basing jurisdiction for their suit on ERISA, plaintiffs allege in their complaint that in administering the benefit plan defendants violated certain ERISA provisions. Ruling that it lacked subject matter jurisdiction, the district court dismissed plaintiffs' complaint on the ground that ERISA excludes governmental plans from the scope of the Act. See 29 U.S.C. § 1003(b)(1). We affirm.
 
 BACKGROUND
 
 2
 Plaintiff Anna Gualandi is a New York public school teacher in the Shoreham-Wading River Central School District (School District). Plaintiff Claudia Travers was a public school teacher in the same district until she retired (plaintiffs or appellants). Both plaintiffs have been members of a labor union called the Shoreham-Wading River Teachers Association (SWRTA or union), and have participated in an employee benefit plan called the SWRTA Out-of-Pocket Reimbursement Fund (Plan).
 
 
 3
 Defendants are the union and its officers, as well as insurance broker J.J. Newman Co., Inc. (Newman), its agents, and various affiliated corporations, all of which entities and individuals have been involved with administering the Plan. Plaintiffs contend defendants' actions with regard to the Plan violated various provisions of ERISA. In particular, they allege defendants violated §§ 104(b)(4), 404(a)(1)(C), and 406(a)(1)(B) of ERISA, 29 U.S.C. §§ 1024(b)(4), 1104(a)(1)(C), 1106(a)(1)(B) (2000), by withholding information from the Plan's participants, breaching their fiduciary duties, and engaging in prohibited transactions with the Plan's funds.
 
 A. The Plan
 
 4
 The Plan, which is the subject of this litigation, is an out-of-pocket reimbursement fund for the benefit of the public school teachers employed in the School District. It was designed to work as follows: when a teacher is attended by a medical provider and the statement for the services rendered is not already covered by one of the numerous policies that insure the teachers, the teacher must pay herself for the medical services rendered. She may then seek reimbursement for her out-of-pocket expense from the Plan at issue in this litigation. The Plan was created by using excess insurance payments from the School District that had been accumulating in a bank account since the 1980s. These excess payments were made under the terms of a series of collective bargaining agreements between the School District and the union. The agreements required the School District to provide medical, dental, optical, life and superimposed major medical insurance to its employees by paying a fixed yearly amount per teacher to insurance broker Newman. In some years, the School District's payments exceeded the total cost of the premiums due for the insurance coverage provided. Newman set aside the excess money in a separate account, which by 1996 amounted to $267,000.
 
 B. The Agreement
 
 5
 In 1996 a dispute arose because the School District refused to contribute a fixed amount sum to the extent that it exceeded the actual cost of the premiums. The School District and the union ultimately resolved the dispute through a settlement agreement. That agreement provided that the School District would now be required to pay only the actual amount of the insurance premiums, not the fixed yearly amount per teacher that it was paying before. The settlement agreement further stated
 
 
 6
 1. The [School] District agrees to forward by December 1, 1996, $60,000 to the SWRTA Insurance Fund Account.
 
 
 7
 2. The [School] District relinquishes any and all claims to any funds previously accumulated in the SWRTA Insurance Fund Account including the above $60,000 payment. [SWRTA] relinquishes any and all claims to funds previously due to the SWRTA Insurance Fund in excess of the $60,000 for the 1995-96 school year. The [School] District will provide any approvals necessary for SWRTA to set up a SWRTA Benefit Trust.
 
 
 8
 The union used the $60,000 specified in the agreement and the money from excess payments already in the account to set up the out-of-pocket reimbursement fund, the Plan at issue in this case.
 
 
 9
 Subsequently, plaintiffs instituted the instant suit based on the manner in which defendants had administered the Plan. When the matter came before Judge Mishler he found the money used by defendants to set up and run the Plan was government funds, which made the Plan a governmental plan not covered by ERISA. Accordingly, the district court dismissed plaintiffs' complaint for lack of subject matter jurisdiction. From the order of dismissal, plaintiffs appeal.
 
 DISCUSSION
 
 10
 ERISA is the sole basis plaintiffs assert for federal jurisdiction over their claims, and the district court dismissed because it determined such jurisdiction was lacking. It held the School District had funded the out-of-pocket reimbursement fund, and it concluded this funding was enough to exclude the Plan from ERISA's coverage as a "governmental plan." On appeal, plaintiffs attack the district court's factual finding and its legal conclusion. They also argue the district court erroneously failed to grant their request for additional discovery.
 
 
 11
 We go first to our standard of review. In reviewing a district court's determination of whether it has subject matter jurisdiction, we review factual findings for clear error and legal conclusions de novo. London v. Polishook, 189 F.3d 196, 198 (2d Cir.1999). "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 348 (2d Cir.2003). We turn next to the merits.
 
 I The School District Funded the Plan
 
 12
 The district court found the School District funded the Plan based on evidence that all of the money originally came from the School District and was specifically earmarked for an employee benefit plan. Plaintiffs concede the School District was the original source of the money, but nonetheless insist that the union, not the School District, actually funded the Plan. In plaintiffs' view, the School District gave the money to the union "with no strings attached," and the union then chose to use it for the Plan. Plaintiffs maintain it was clearly erroneous for the district court to find otherwise.
 
 
 13
 The trial court based its finding on three pieces of evidence: (1) the affidavit of one William Cala, the School District's superintendent at the time of the 1996 settlement agreement between the School District and the union; (2) the language of the settlement agreement; and (3) the language of the collective bargaining agreements. In the affidavit, Cala states he negotiated the settlement agreement on behalf of the School District and it was his understanding that the money turned over to the union under the agreement could be used only to purchase additional insurance for School District employees. The court found this testimony supported by the language of the settlement agreement, which provided that the School District forward $60,000 to the "SWRTA [union] Insurance Fund Account" and for the School District to grant "any approvals necessary for SWRTA [the union] to set up a [union] Benefit Trust." In addition, the collective bargaining agreements provided that the insurance money paid by the School District "shall be spent for the insurance plans so designated."
 
 
 14
 Plaintiffs contend the district court should not have considered the Cala affidavit because it contains legal conclusions. Yet, even assuming that to be the case, the district court did not rely on any legal conclusions in the affidavit. Instead, it looked to Cala's statements as evidence of how he and the School District understood the terms of the settlement agreement.
 
 
 15
 Appellants also assert the affidavit constituted parol evidence that should not have been considered because the settlement agreement was a fully integrated contract. The parol evidence rule generally prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements to explain the meaning of a contract that the parties have reduced to an unambiguous integrated writing. 11 Richard A. Lord, Williston on Contracts § 33:1, at 541 (4th ed.1999). Such extrinsic evidence may not be used to modify, explain, vary or supplement the written integrated contract. Id. at 550-51. To conclude that the settlement agreement is an integrated contract subject to the parol evidence rule, however, we would need to find that the parties intended the settlement agreement to constitute the complete and final expression of their agreement. See Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir.1999). If anything, there is evidence of just the contrary intent in this case, since the agreement explicitly states "past practice ... shall be admissible to clarify any ambiguity in the express provisions of this Agreement." Thus, there is no merit to appellants' parol evidence argument.
 
 
 16
 More fundamentally, appellants erroneously assume the critical issue to be whether the settlement agreement created a legally enforceable obligation restricting the union's use of the money. They seek to litigate the agreement itself in order to show that the School District did not fund the Plan. But we need not determine the legal effect of the agreement in order to resolve the question of the Plan's funding. Our primary concern is to determine whether the School District intended to fund the Plan and whether the union actually used the School District's money for that purpose. The Cala affidavit is highly relevant to that inquiry irrespective of the extent to which it may be used to interpret the settlement agreement itself.
 
 
 17
 Appellants make a number of other assertions that are also without merit. They attack certain statements defendants made to the district court, but ignore the fact that the district court did not rely on any of these statements. They also emphasize allegations in defendants' pleadings that suggest the union's ownership of the money from the School District, but they do not (and cannot) point to anything to indicate that the School District intended to give the money to the union with no strings attached.
 
 
 18
 In sum, we are unable to conclude the district court was in error, let alone clearly erroneous, in finding the School District funded the Plan. By no means are we "left with the definite and firm conviction," Bronx Household of Faith, 331 F.3d at 348, that the district court committed a mistake. We therefore affirm its factual finding that the School District funded the Plan.
 
 
 19
 II The School District's Funding Made the Plan Governmental for ERISA Purposes
 
 
 20
 Having established that the School District funded the Plan, the district court went on to hold that the Plan was therefore a governmental plan excluded from ERISA coverage. We review this legal conclusion de novo.
 
 
 21
 Title I of ERISA specifically excludes from its coverage any employee benefit plan that is a governmental plan. 29 U.S.C. § 1003(b). The Act defines governmental plan as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). As the plain language here indicates, a plan need only be established or maintained by a governmental entity in order to constitute a governmental plan. Roy v. Teachers Ins. & Annuity Ass'n, 878 F.2d 47, 50 (2d Cir.1989).
 
 
 22
 Our Court has not yet had occasion to rule on whether a governmental entity may be considered to have established a plan for ERISA purposes simply by providing the plan's exclusive funding. ERISA itself does not further define the term "establish," which can mean both "to bring into existence," and "to provide for" or "endow." Webster's Third New International Dictionary (1981). The Act's legislative history, however, convinces us to construe Congress' language broadly.
 
 
 23
 We pause here before resolving the funding issue to explore why Congress differentiated between private and governmental plans. When Congress began considering new legislation to regulate employee benefit plans in 1973, subcommittees of both houses had already undertaken detailed studies of the issue, focusing on the private sector. See H.R.Rep. No. 93-533, at 8 (1973), reprinted in 1974 U.S.C.C.A.N. 4,639, 4,646; 119 Cong. Rec. 130 (1973) (statement of Sen. Williams). Among other things, the Senate Subcommittee on Labor had provided a public forum for workers who, in "one heartbreaking story after another" dramatically documented widespread weaknesses in existing private pension plans. 119 Cong. Rec. 130 (statement of Sen. Williams). The hearings provided the spur that pricked Congress' conscience, resulting ultimately in the enactment of ERISA.
 
 
 24
 Most in need of federal regulation were the vesting, funding, fiduciary and disclosure requirements of benefit plans. Id. Initially, coverage extended, in the bill introduced in the House, to state and local government plans as well as to private ones. See H.R. 2, 93d Cong. §§ 101, 201, 301 (Jan. 3, 1973), reprinted in 1 Subcomm. on Labor of the Comm. on Labor and Pub. Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, at 14-15, 51-52, 58-59 (1976) [Legislative History]. Only later, and over the objections of at least one member of Congress, were all government plans — state and local as well as federal — excluded. See H.R. Rep. 93-533, at 43; 120 Cong. Rec. 4,305-06 (1974) (statement of Rep. Broyhill). Although some concern was expressed regarding the consequences of leaving government plans unregulated, see S.Rep. No. 93-383, at 67 (1973), reprinted in 1974 U.S.C.C.A.N. 4,890, 4,952, there was inadequate information respecting benefit plans in the public sector to evaluate the impact that regulation might have. See H.R.Rep. No. 93-533, at 9. It was therefore decided that all government plans would be exempted from regulation for the time being and set aside for further study. See id.; 29 U.S.C. § 1231.
 
 
 25
 Discussions of the governmental plan exemption in the legislative history are filled with such general references as "public employee plans," the protection of "public employees," and "plans sponsored by state and local governments." See, e.g., H.R.Rep. No. 93-533, at 9, 43; H.R.Rep. No. 93-779, at 46 (1974), reprinted in 2 Legislative History, at 2,590, 2,635. One Senator commented that "State and local governments must be allowed to make their own determination of the best method to protect the pension rights of municipal and state employees." 119 Cong. Rec. 741 (statement of Sen. Bentsen). Thus, it is plain that in differentiating between private and governmental plans, Congress was "concerned more with the governmental nature of public employees and public employers than with the details of how a plan was established or maintained." See Roy, 878 F.2d at 50 (quoting Feinstein v. Lewis, 477 F.Supp. 1256, 1262 (S.D.N.Y.1979)).
 
 
 26
 Published opinions of the Department of Labor (DOL) also support the conclusion that an employee benefit plan is a governmental plan if it is exclusively funded by a governmental agency. A 1999 Opinion Letter states that the term governmental plan includes "a plan administered by an `employee organization,'... that provides benefits exclusively to employees of a political subdivision, agency, or instrumentality of local government..., provided that the plan is funded exclusively by the government and by the government's employees who are members of the sponsoring employee organization." Dep't of Labor ERISA Op. Letter No. 99-15A (Nov. 19, 1999), 1999 ERISA LEXIS 20, at *6 (quoting Dep't of Labor ERISA Op. Letter No. 86-10A (Feb. 18, 1986), 1986 ERISA LEXIS 18). A 1985 Opinion Letter similarly advised that a drug plan was subject to the governmental plan exception because "only a governmental entity contributes to the [plan] on behalf of its employees and all employees covered are employees of that governmental entity." Dep't of Labor ERISA Op. Letter No. 85-21A (May 8, 1985), 1985 ERISA LEXIS 23, at *4. Although DOL Opinion Letters are not binding, that executive agency is nonetheless "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," and we have often relied on DOL Opinion Letters for their persuasive value. See Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 47 & n. 1 (2d Cir.2002) (quoting Bragdon v. Abbott, 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) and citing cases) (noting that despite lack of formal notice-and-comment procedures attending DOL Opinion Letters, such opinions should be accorded deference because DOL has statutory power to issue administrative interpretations of ERISA that carry the force of law).
 
 
 27
 In light of all this, we are convinced that Congress aimed for a broad definition of the term "establish." We therefore hold that exclusive governmental funding is enough to constitute governmental establishment of a plan. Cf. Fromm v. Principal Health Care of Iowa, Inc., 244 F.3d 652, 653-54 (8th Cir.2001) (by offering government employees the choice of multiple plans and paying the premiums on these plans, city had established the plans); Silvera v. Mut. Life Ins. Co. of N.Y., 884 F.2d 423, 425-27 (9th Cir.1989) (by purchasing a plan for its employees, a city had established the plan even though the plan was designed, set up, and administered by a private insurer); Feinstein, 477 F.Supp. at 1260 ("The mere fact that a town or school district sets up a benefit plan for its employees as a consequence of negotiations and collective bargaining rather than because of some unilateral action or decision simply does not lead to the conclusion that the plan was not `established' by the town or school district.").
 
 
 28
 By providing the exclusive funding for the Plan in this case, the School District established that Plan within the meaning of ERISA. Further, the School District established the Plan "for its employees," 29 U.S.C. § 1002(32), since only School District employees are allowed to participate. There is no dispute that the School District is a governmental entity for ERISA purposes. All of these circumstances lead inevitably to the conclusion that the Plan here is a governmental one, and that it is therefore excluded from the purview of Title I of ERISA.
 
 
 29
 III Plaintiffs Were Not Entitled to Further Discovery
 
 
 30
 Plaintiffs' final argument is that the district court should have given them an opportunity to pursue further discovery on the jurisdictional issue. It is not that they were denied discovery altogether. On the contrary, appellants pursued discovery on the jurisdictional issue from August 10, 2001 through October 22, 2001 obtaining over 1,200 pages of documents. On February 15, 2002 plaintiffs requested additional discovery, but the district court instead dismissed the case under Federal Rule of Civil Procedure 12(b)(1), without explicitly responding to or ruling on appellants' request.
 
 
 31
 In resisting a motion to dismiss under Rule 12(b)(1), plaintiffs are permitted to present evidence (by affidavit or otherwise) of the facts on which jurisdiction rests. See Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986). In addition, courts generally require that plaintiffs be given an opportunity to conduct discovery on these jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party. See id. Although a motion to dismiss for lack of jurisdiction cannot be converted into a Rule 56 motion, a court may nonetheless look to Rule 56(f) for guidance in considering the need for discovery on jurisdictional facts. See id.; see also Exch. Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir.1976) ("[A] body of decisions has developed under Rule 56 that offer guidelines which assist in resolving the problem encountered if the affidavits submitted on a 12(b)(1) motion should reveal the existence of factual problems.").
 
 
 32
 To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful. See Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy, 891 F.2d 414, 422 (2d Cir.1989). If the district court denies the party's request — even implicitly — we review that decision under an abuse of discretion standard. See Oneida Indian Nation v. City of Sherrill, 337 F.3d 139, 167-68 (2d Cir. 2003); First City, Texas-Houston, N.A. v. Rafidain Bank, 150 F.3d 172, 175 (2d Cir. 1998) (reviewing for abuse of discretion because district court implicitly denied motion to compel discovery).
 
 
 33
 Analogizing to the Rule 56(f) case law, we find that while plaintiffs submitted an affidavit requesting discovery of particular documents and depositions, they failed to show how the information they hoped to obtain from this discovery would bear on the critical issue of who funded the Plan. As discussed above, this issue turns more on how the School District viewed the settlement agreement than on whether the settlement agreement legally restricted the union's use of the money. Yet plaintiffs' discovery request focused almost entirely on information held by the union and the insurance broker defendants. Plaintiffs did ask to subpoena "relevant documents and records of [the School District] (to obtain records and internal communications on the subject matter during 1993 to 1997)," but they did not describe what they hoped these documents and records would show or how this would impact the court's decision.
 
 
 34
 Although the district court did not explicitly rule on plaintiffs' discovery request, it implicitly denied that request by making the findings of fact necessary to dismiss for lack of jurisdiction. Since appellants were unable to demonstrate that additional discovery was needed in order to decide the jurisdictional issue, the district court did not abuse its discretion in denying plaintiffs' request. Cf. Qualls v. Blue Cross of Cal., Inc., 22 F.3d 839, 844 (9th Cir.1994) (holding that district court did not abuse discretion by implicitly denying discovery request where "the additional discovery would not have precluded summary judgment").
 
 CONCLUSION
 
 35
 Accordingly, for the foregoing reasons, we affirm the district court's order dismissing this case for lack of subject matter jurisdiction.