AmBase Corp v. United States of America

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: June 10, 2013                    Decided: September 9, 2013)

Docket No. 12-3563-cv

_____

AMBASE CORP.,

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

Before: POOLER, CARNEY, *Circuit Judges*, and KORMAN,[*] *District Judge*.

Appeal from United States District Court for the District of Connecticut

(Warren W. Eginton, *J.*), granting in part and denying in part Plaintiff AmBase

Corp.'s claim for a refund for the 1989 tax year.  Plaintiff's refund claim is based

_____

[*] The Honorable Edward R. Korman, United States District Court for the
Eastern District of New York, sitting by designation.

on a proposed amendment to its consolidated return for the 1992 tax year, for which it seeks to increase the bad debt deduction claimed on behalf of its affiliate, Carteret Savings Bank F.A.  Carteret, a thrift which calculates its bad debt deduction under the reserve method, was seized by the Resolution Trust Corporation in 1992.  The district court, through its November 28, 2011 memorandum of decision, May 23, 2012 memorandum of decision, and July 5, 2012 final judgment and order, granted AmBase's claim to the extent that the claimed deduction offset Carteret's post-seizure additional income in tax year 1992 but denied the claim in all other respects.  On appeal, we agree that the district court had subject-matter jurisdiction and affirm its grant of AmBase's claimed deduction to the extent that it offsets Carteret's post-seizure income for the 1992 tax year.  We further hold that the district court should grant AmBase's claimed deduction to the extent that it derives from Carteret's post-seizure bad debts for the 1992 tax year.  Accordingly, we AFFIRM in part and VACATE in part the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

_____

2

PETER H. WINSLOW (Samuel A. Mitchell, Gregory K. Oyler, *on the brief*), Scribner, Hall & Thompson, LLP, Washington, DC, *for Plaintiff-Appellant*.

JENNIFER M. RUBIN, Attorney, Tax Division (David Fein, United States Attorney for the District of Connecticut, Kathryn Keneally, Assistant Attorney General, Tax Division, Jonathan S. Cohen, Attorney, Tax Division), Department of Justice, Washington, DC, *for Defendant-Appellee*.

POOLER, *Circuit Judge*:

Plaintiff-Appellant AmBase Corp. ("AmBase") brought a refund claim for tax year 1989 based on a carryback[1] generated from a proposed amendment to its consolidated federal income tax return for the 1992 tax year. The proposed amendment seeks to increase the bad debt deduction claimed on the return by AmBase's affiliate, Carteret Savings Bank F.A ("Carteret"). Carteret, a "thrift"[2] which calculates its bad debt deduction under the reserve method, *see* I.R.C. §§ 585, 593, was seized by the Resolution Trust Corporation ("RTC") on

---

[1] "Carrybacks" refer to when the taxpayer applies net operating losses for a tax year to preceding tax years. *See* I.R.C. § 172(b).

[2] "Thrifts" are defined as "any mutual savings bank not having capital stock represented by shares, any domestic building and loan association, and any cooperative bank without capital stock organized and operated for mutual purposes and without profit." Treas. Reg. § 1.593-4.

3

December 4, 1992. The United States District Court for the District of Connecticut (Warren W. Eginton, *J.*), through its November 30, 2011 memorandum of decision, *AmBase Corp. v. United States*, 834 F. Supp. 2d 71 (D. Conn. 2011), May 23, 2012 memorandum of decision, *AmBase Corp. v. United States*, No. 3:08-cv-651-WWE, 2012 WL 1884874 (D. Conn. May 23, 2013), and July 5, 2012 final judgment and order, granted AmBase's claim to the extent that the bad debt deduction offset Carteret's additional post-seizure income in tax year 1992 but denied the claim in all other respects. On appeal, we hold that the district court had subject-matter jurisdiction and affirm its grant of AmBase's claimed deduction to the extent that it offsets Carteret's post-seizure income for the 1992 tax year. We further hold that the district court should grant AmBase's claimed deduction to the extent that it derives from Carteret's post-seizure bad debts for the 1992 tax year. Accordingly, we AFFIRM in part and VACATE in part the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

In August 1988, AmBase, the successor corporation to The Home Group, Inc., purchased Carteret, a federally chartered stock savings bank or thrift. After

4

acquisition, AmBase filed consolidated federal income tax returns with Carteret.

On December 4, 1992, the Office of Thrift Supervision seized Carteret and put it

into the conservatorship of the RTC due to Carteret's failure to satisfy capital

requirements under the Financial Institutions Reform, Recovery, and

Enforcement Act.  In 1996, the RTC transferred receivership to the Federal

Deposit Insurance Company ("FDIC").

The dispute in this appeal relates to AmBase's 1992 consolidated federal

income tax return, filed on August 30, 1993.  On its return, AmBase reported

Carteret's tax items from January 1, 1992 through December 4, 1992.  It did not,

however,  include Carteret's post-seizure tax items, as AmBase did not control

Carteret post-seizure, and the RTC had not provided AmBase with the relevant

records.[3]  At the time of filing, proposed regulations under I.R.C. § 597 allowed a

consolidated group to elect irrevocably to disaffiliate from an institution in its

affiliated group that had been placed in receivership.  *See* Treatment of

Acquisition of Certain Financial Institutions; Certain Tax Consequences of

Federal Financial Assistance to Financial Institutions, 57 Fed. Reg. 14,804, 14,812-

814 (proposed April 23, 1992).  However, such an election could not become

---

[3] Both parties have stipulated that the RTC and FDIC failed to provide
AmBase with the relevant records until at least May 31, 1996.

binding until the regulations had been finalized, *see id.* at 14,817-818, which did not occur until December 1995, T.D. 8641, 1996-6 I.R.B. 4, 60 Fed. Reg. 66,091; *see also* Treas. Reg. § 1.597-4 (the final regulation). On its original 1992 return, AmBase included a statement electing to disaffiliate from Carteret. On April 28, 1997, after having received an extension of time, AmBase timely notified the Commissioner of Internal Revenue (the "Commissioner") of its decision to reverse its previous decision to disaffiliate from Carteret.

On March 14, 2000, AmBase filed an amended consolidated federal return for 1992 in which it sought to amend its 1992 consolidated federal income tax return to increase Carteret's claimed bad debt deduction, calculated under the reserve method, and generate a net operating loss. On that same date, AmBase also filed an amended consolidated federal income tax return for 1989, on which it sought to apply the 1992 net operating loss and create a refund. The IRS denied the refund claim, and, on April 29, 2008, AmBase filed a complaint in the district court against the United States (the "Government").

Consideration of AmBase's refund claim requires an understanding of the reserve method for calculating bad debt deductions. We turn now to a description of the applicable law.

6

## II. Bad Debt Deductions and the Reserve Method

The Internal Revenue Code allows taxpayers to take a deduction relating to worthless or "bad" debts. I.R.C. §§ 166, 585, 593. Two methods exist for calculating this deduction: the specific charge-off method and the reserve method. The specific charge-off method allows taxpayers to deduct the basis of a bad debt in the year in which the debt becomes worthless. I.R.C. § 166. The reserve method allows taxpayers to create a "reserve" of funds in anticipation of bad debts, and deduct, instead of the basis in a particular bad debt, a "reasonable addition to the reserve" for the year (the "Reasonable Addition"). I.R.C. §§ 585(a), 593(a). A bad debt must be accounted for in the year in which it becomes worthless. *See* I.R.C. § 166(a)(1) (specific charge-off method); *Calavo, Inc. v. Comm'r*, 304 F.2d 650, 654 (9th Cir. 1962) (the reserve method). However, it can be difficult for a taxpayer to determine the year in which a particular debt becomes worthless. *See, e.g., Boehm v. Comm'r*, 326 U.S. 287, 292 (1945); *Young v. Comm'r*, 123 F.2d 597, 600 (2d Cir. 1941). The advantage of the reserve method over the specific charge-off method is that, under the former, the taxpayer's bad-debt deduction is not tied to a determination of worthlessness of any particular debt. It allows the taxpayer to make a reasonable prediction of the amount of

7

debt that will become worthless in a given year without having to identify specific worthless loans, and claim a deduction based on that amount.

Specific bad debts are still relevant to the reserve method. In the year in which a bad debt becomes worthless, the taxpayer, instead of a taking another deduction, charges off the debt by reducing the amount of the reserve. *Nash v. United States*, 398 U.S. 1, 3-4 (1970). This increases the Reasonable Addition otherwise allowable for the year. *See Smith Elec. Co. v. United States*, 461 F.2d 790, 791 (Ct. Cl. 1972). Similarly, in any year in which a bad debt is recovered, specific charge-off method taxpayers include the recovery in gross income, while reserve method taxpayers instead increase the amount of the reserve, decreasing the Reasonable Addition otherwise allowable for the year. *See United States v. Bank of Am. Trust & Sav. Ass'n*, 303 F.2d 304, 306 (9th Cir. 1962); *see also* 1 *Mertens, Law of Federal Income Taxation* § 7:35 (2013). Upon liquidation, the taxpayer's unused bad debt reserve is included in gross income. *W. Seattle Nat. Bank of Seattle v. Comm'r*, 288 F.2d 47, 48-50 (9th Cir. 1961). *But see Nash*, 398 U.S. at 3-4 (declining to apply this "tax benefit rule" when accounts receivable net of reserves were transferred by partnership during liquidation).

Use of the reserve method was formerly available to a broader group of taxpayers, but in 1987 its use was restricted. *See* Pub. L. No. 99-514, § 805, 100 Stat. 2085, 2361 (1986) (repealing I.R.C. § 166 (c)); *see also* Staff of J. Comm. on Taxation, 99th Cong., Tax Reform Proposals: Accounting Issues, 68 (Comm. Print 1985). However, certain financial institutions are still allowed to use the reserve method. I.R.C. §§ 581, 585(a)(1), 593(a)(1). AmBase's affiliate, Carteret, is a thrift eligible to use the reserve method under I.R.C. § 593 and Treasury Regulation § 1.593-4. Thrifts are required to establish two separate reserves, one for "nonqualifying loans" and one for "qualifying real property loans."[4] Treas. Reg. § 1.593-7(a)(1); *see also* Treas. Reg. § 1.593-11 (defining terms).

The reserve method gives the taxpayer a considerable degree of discretion to determine the amount of its bad debt deduction and reduce tax liability. This discretion is restricted by several requirements. First, the taxpayer must earmark the amounts of the reserves, which "are not to be used for any purpose other than to apply against bad debts as they occur." *Levelland Sav. & Loan Ass'n v. United States*, 421 F.2d 243, 246 (5th Cir. 1970) (citing *Rio Grande Bldg. & Loan Ass'n v. United States*, 36 T.C. 657 (1961)).

---

[4] Some thrifts are also required to establish a third "supplemental reserve for losses on loans," Treas Reg. § 1.593-7(a), additions to which do not lead to a deduction, *see* I.R.C. § 593(b); Treas. Reg. § 1.593-5.

Second, the Reasonable Addition must be "reasonable," as defined by the

Internal Revenue Code and Treasury Regulations, which describe several

methods for calculating the Reasonable Addition.[5]  Relevant to this appeal is the

"experience method," also called the "six-year moving average" formula, *see*

I.R.C. §§ 585(b)(2), 593(b)(3), which "seeks to ascertain a 'reasonable' addition to a

bad-debt reserve in light of the taxpayer's recent chargeoff history."  *Thor Power*

*Tool Co. v. Comm'r*, 439 U.S. 522, 547 (1979) (citing *Black Motor Co. v. Comm'r*, 41

B.T.A. 300, 302 (1940)).  The experience method starts with the balance of the

reserve at the close of the taxable year and then calculates a maximum allowable

value for the reserve, based on a ratio which looks to total bad debts and total

loans for the current and five preceding taxable years.  I.R.C. § 585(b)(2).  The

difference between the maximum allowable value and current balance is the

maximum addition to the reserve that is permitted (the "Maximum Addition").

The taxpayer may claim as a deduction a Reasonable Addition up to, but not

exceeding, the Maximum Addition.  I.R.C. § 585(b)(2).  "Because a bad debt

reserve is an estimate of *future* losses, the taxpayer will not invariably increase

---

[5] The word "method" is used twice in this section.  First, there is the "method" for taking the deduction, either the specific charge-off method or the reserve method.  Second, under the reserve method, there is the "method" for determining the amount of the deduction (i.e., the Reasonable Addition).

the reserve" based on its past history of bad debts. *Roth Steel Tube Co. v. Comm'r*, 620 F.2d 1176, 1179 (6th Cir. 1980) (emphasis added). The taxpayer's Reasonable Addition is calculated and credited at the close of the tax year. Treas. Reg. § 1.593-5(b)(1).

As a third qualification, "a taxpayer is not to be permitted to enlarge its reserve account retroactively." *Rio Grande*, 36 T.C. at 664; *see also Rogan v. Commercial Disc. Co.*, 149 F.2d 585, 588 (9th Cir. 1945); *Wengel, Inc. v. United States*, 306 F. Supp. 121, 123-24 (E.D. Mich. 1969); Treas. Reg. § 1.166-4(b)(2). This rule follows from the purpose of the bad debt reserve as an estimate of *future* losses for which the taxpayer freezes funds. A retrospective enlargement would allow the taxpayer to claim a deduction based on funds that it did not have to freeze on its books. This appeal asks us to consider exceptions to the rule of non-retroactivity.[6]

---

[6] The regulations provide one exception:

> If an adjustment with respect to the income tax return for a taxable year is made, and if such adjustment (whether initiated by the taxpayer or the Commissioner) has the effect of permitting an increase, or requiring a reduction, in the amount claimed on such return as an addition to the reserve for losses on nonqualifying loans or to the reserve for losses on qualifying real property loans, then the amount initially credited to such reserve for such year pursuant to subparagraph (1) of this paragraph may have to be increased or decreased, as the case may be, to the extent necessary to reflect such adjustment.

## III. AmBase's Refund Claim

AmBase's refund claim turns on a proposed amendment to its consolidated federal income tax return for the 1992 tax year. On its initial return, AmBase calculated a Maximum Addition of approximately $101 million but only claimed as a deduction a Reasonable Addition of approximately $56 million.[7] On its amended return, AmBase seeks (1) to increase its Maximum Addition to approximately $125 million and (2) to increase its claimed Reasonable Addition deduction from approximately $56 million to the new maximum value. In other words, AmBase is claiming an additional deduction of approximately $69 million. Approximately $24 million of that $69 million relates directly to Carteret's post-seizure activities. The remaining $45 million is the amount by which AmBase could have, but chose not to, increase the reserve on its original return, based on its initial calculation of the Maximum Addition.[8] AmBase

Treas. Reg. § 1.593-5(b)(2). We discuss this exception further below. *See infra* Discussion II.A.

[7] As mentioned above, thrifts must keep two separate reserves. The values of the Reasonable Addition and Maximum Addition discussed in this opinion were calculated by separately determining the values for each reserve and then adding the values together. For simplicity's sake, we refer to the two reserves as one.

[8] In other words, the $45 million is the difference between the $101 million Maximum Addition and the $56 million claimed Reasonable Addition from the initial 1992 return.

argues that it is entitled to the entirety of this additional deduction based on its decision to include Carteret, post-seizure, on its 1992 consolidated federal income tax return.

The IRS denied AmBase's refund claim, and, on April 29, 2008, AmBase filed a complaint in the district court against the Government. Before the district court, the Government moved to dismiss for lack of subject-matter jurisdiction. On March 31, 2010, the district court conditionally dismissed AmBase's claim, but granted AmBase a limited discovery period in which to seek evidence establishing subject-matter jurisdiction. On February 28, 2011, on AmBase's motion, the district court set aside its previous dismissal. In response to two partial motions for summary judgment by AmBase, the district court issued a November 28, 2011 memorandum of decision, *AmBase Corp.*, 834 F. Supp. 2d 71, and a May 23, 2013 memorandum of decision, *AmBase Corp.*, 2012 WL 1884874, which granted in part and denied in part AmBase's refund claim. AmBase's claim was granted to the extent that it offset the additional income of Carteret during the post-seizure period of tax year 1992, from December 5 to December 31, which was not included on AmBase's original return. In all other respects, the district court denied AmBase's claim. The district court issued a July 5, 2012 final judgment and order consistent with its prior memoranda.

13

AmBase now appeals, arguing that the district court should have allowed its amendment and refund claim in its entirety. On appeal, the Government renews its argument that the district court did not have subject-matter jurisdiction.

**DISCUSSION**

We review appeals from motions for summary judgment de novo. *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013). "In reviewing a district court's determination of whether it has subject matter jurisdiction, we review factual findings for clear error and legal conclusions de novo." *Gualandi v. Adams*, 385 F.3d 236, 240 (2d Cir. 2004).

On appeal, we hold that the district court did have subject-matter jurisdiction to hear AmBase's claim. We agree with the district court that AmBase may amend its 1992 return to increase its bad debt deduction based on Carteret's post-seizure income in 1992, and further hold that AmBase may amend to increase its bad debt deduction based on Carteret's post-seizure bad debts. Accordingly, we affirm the district court in part and vacate in part, remanding for further proceedings consistent with this opinion.

## I. Subject-Matter Jurisdiction

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued[,] and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Testan*, 424 U.S. 392, 399 (1976) (internal quotation marks omitted). "Congress has broadly consented to suits against the United States in the district courts for the refund of any federal taxes alleged to have been erroneously or illegally assessed or collected, or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." *United States v. Forma*, 42 F.3d 759, 763 (2d Cir. 1994) (quoting 28 U.S.C. § 1346(a)(1)) (internal quotation marks and alterations omitted). However, Congress has placed several conditions on a taxpayer's right to maintain a refund suit, including a requirement that the taxpayer satisfy the applicable statute of limitations by filing a timely administrative claim. *Id.* at 763 & n.8. Under Section 6511(a) of the Internal Revenue Code, a taxpayer must file an administrative refund claim "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later." I.R.C. § 6511(a). However, the three-year limitations period is replaced with a seven-year period if the refund claim relates to the deductibility of a bad debt. I.R.C. § 6511(d)(1).

While taxpayers may file a formal claim for a refund, *see* Treas. Reg. § 301.6402-3 (listing requirements for formal refund claim), "[i]nformal claims have long been recognized as valid claims." *New Eng. Elec. Sys. v. United States*, 32 Fed. Cl. 636, 641 (1995). As a type of informal claim, taxpayers may file "protective claims," which "preserve the taxpayers' right to claim a refund when the taxpayer's right to the refund is contingent on future events and may not be determinable until after the statute of limitations expires." Chief Counsel Advisory 200848045, 2008 WL 5030125 (2008); *see also United States v. Kales*, 314 U.S. 186, 196 (1941). Informal claims have three components: (1) they must provide the IRS notice of the taxpayer's claim to a refund; (2) they must "describe the legal and factual basis for the refund;" and (3) they must have a written component. *New Eng. Elec. Sys.*, 32 Fed. Cl. at 641. After having timely filed an initial claim, a taxpayer may make an amendment that relates back to the prior claim, provided that "the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits of the original claim." *St. Joseph Lead Co. v. United States*, 299 F.2d 348, 350 (2d Cir. 1962); *see also* Treas. Reg. § 301.6402-2(b)(1). A "claim seeking refund upon one asserted fact situation may not be amended out of time so as to require an

16

investigation of matters not germane to the original claim." *Weisbart v. Dep't of Treasury*, 222 F.3d 93, 98 (2d Cir. 2000) (internal quotation marks omitted), *abrogation on other grounds recognized by In re WorldCom, Inc.*, No. 12-803, 2013 WL 3779354, at *9 (2d Cir. July 22, 2013).

Here, the parties agree that, under Section 6511(a), AmBase had until March 31, 1998 to file its claim. AmBase filed its amended return on March 14, 2000, after that date. Before the district court, the Government moved to dismiss the refund claim for lack of subject-matter jurisdiction, but AmBase put forth several arguments as to why its claim was timely. First, it argued that the reserve method regulations required an amended return. Second, it argued that, under the three-year limitations period, the 2000 claim was timely, because it related back to four earlier claims: (1) an attachment to AmBase's original 1992 return, (2) a June 30, 1995 note made during a separate Government audit, (3) a June 1995 protective claim, and (4) a September 1996 protective claim filed by the FDIC on behalf of Carteret. Third, AmBase argued that the seven-year limitations period, under which the 2000 claim would be timely, applied to its refund claim. The district court rejected these arguments and conditionally dismissed the refund claim. With respect to AmBase's argument relying on the

17

1996 FDIC claim, the court's dismissal rested on the fact that the document was not before the court, and the court granted AmBase a limited discovery period in which to acquire the FDIC claim. After AmBase produced the 1996 FDIC claim, the district court held that it had subject-matter jurisdiction and set aside the order of dismissal.

On appeal, the Government renews its argument that the district court lacked subject-matter jurisdiction to consider the refund claim, while AmBase argues that "[t]he Government has not appealed th[e] jurisdictional holding." Appellant's Br. at 2. While the Government has not cross-appealed, "we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*." *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006). We therefore review the basis on which the district court found subject-matter jurisdiction and hold that the district court properly found that jurisdiction exists.

The district court held that it had subject-matter jurisdiction based on a 1996 formal protective claim, for tax years 1982 to 1992, filed by the FDIC when it was Carteret's receiver. *See* Treas. Reg. § 301.6402-7 (allowing agencies to file returns on behalf of banks in receivership). We reproduce the relevant portions

18

of the claim in a footnote.[9] The Government argues that AmBase's 2000 claim

_____

[9] In an attachment to the protective claim, the FDIC stated, in relevant part, the following:

> The amended return that is being filed here, itself may be amended when additional relevant information is discovered.

> An increase/decrease in total deductions and/or total income and a decrease in taxes due are due to the following:

> . . .

> 3) Savings institutions that fail the "60% asset test" of IRC 7701(a)(19) are not eligible to use the reserve method of accounting for bad debts under IRC 593. Such an institution is treated as a bank and therefore must compute its[] bad debts under IRC 585. If the institution is treated as a "large bank", as defined in IRC 585(c), it must compute its bad debts using the specific charge-off method under IRC 166. Net operating losses attributable to bad debts treated in this manner are eligible for a 10 year carryback under IRC 172(b)(1)(D), instead of the usual 3. This refund claim includes the carryback of the 1992 losses eligible for a 10 year carryback under IRC 172(b)(1)(D) to the taxable year of the refund as a result of any required use of the specific charge-off method of accounting for bad debts.

> 4) Under certain conditions, (such as the occurrence of a change in underlying facts under Treas. Reg. 1.446-1(e)(2)(ii)(b)), banks using the reserve method for deducting bad debts under IRC 585(b) can switch to the specific charge-off method under IRC 166. Net operating losses attributable to bad debts treated in this manner are eligible for a 10 year carryback, as allowed under IRC 172(b)(1)(D), instead of the usual 3. This refund claim represents the carryback of the 1992 losses to the taxable year of the refund to the extent such losses are eligible [for] a 10 year carryback period under IRC 172(b)(1)(D) as a result of switching to the specific charge-off method of accounting for bad debts.

19

was "not germane" to the 1996 FDIC claim because the two claims have different factual bases. We disagree. The 1996 FDIC claim addressed Carteret's bad debts and its method of calculating the bad debt deduction, and it specifically noted potential net operating losses and carrybacks. Especially in light of AmBase's communications with the IRS regarding its decision to disaffiliate, we hold that the facts relating to AmBase's 2000 refund claim "would necessarily have been ascertained" upon consideration of the 1996 FDIC claim. We decline to give the FDIC claim "a crabbed or literal reading, ignoring all the surrounding circumstances which give it body and content." *United States v. Commercial Nat. Bank of Peoria*, 874 F.2d 1165, 1171 (7th Cir. 1989) (internal quotation marks omitted). "The focus is on the claim as a whole, not merely the written component." *Id.* (internal quotation marks omitted).

---

5) Under IRC 5511(d) a taxpayer has 7 years to determine whether a debt or a security has become worthless. In the case of a failing financial institution, management typically refrains from charging off their bad debts in order to artificially retain capital and keep government regulators at bay. This amended return reflects adjustments to deduct debts or securities in the taxable year in which such debts actually became worthless.

J.A. 840-41.

Because we agree with the district court's holding that it had subject-matter jurisdiction, we do not consider the other purported bases for jurisdiction.

## II.  AmBase's Claim on the Merits

We next turn to the merits of AmBase's claim.  AmBase seeks to amend its return and claim an additional $69 million Reasonable Addition deduction. Approximately $24 million of that $69 million derives from Carteret's post-seizure activities, while the remaining $45 million is the difference between AmBase's original Maximum Addition and Reasonable Addition.   AmBase argues that it is entitled to the entirety of this additional deduction based on its decision to include Carteret, post-seizure, on its 1992 consolidated federal income tax return.

As discussed below, we hold, as the district court did, that AmBase may increase its deduction to the extent that it offsets Carteret's post-seizure additional income for the 1992 tax year.  We further hold that AmBase may also increase its deduction to the extent it derives from Carteret's post-seizure additional bad debts for the 1992 tax year.  In all other respects, we hold that the

21

district court properly denied AmBase's claim.[10]

## A. Carteret's Post-Seizure Income

The district court held that AmBase could increase its bad debt deduction in the amount necessary to offset Carteret's post-seizure additional income for tax year 1992. *AmBase Corp.*, 834 F. Supp. 2d at 75-77. We agree and affirm the district court. The Government, while contesting subject-matter jurisdiction, does not dispute AmBase's refund claim to the extent that it rests on this ground.

We pause to briefly explain the principle under which the district court allowed AmBase to claim an additional deduction. As discussed above, a taxpayer using the reserve method is generally "not to be permitted to enlarge its reserve account retroactively." *Rio Grande*, 36 T.C. at 664. However, the Commissioner recognizes two related exceptions to this rule. First, if the taxpayer in a tax year has taken a Reasonable Addition equal to the Maximum Addition, and if an adjustment to the taxpayer's income tax return ("whether initiated by the taxpayer or the Commissioner") permits an increase in the Maximum Addition, the taxpayer may increase its Reasonable Addition to take

---

[10] We leave for the district court on remand the determination of the actual amount of the increased deduction and the amount of AmBase's refund.

into account the new Maximum. *AmBase*, 834 F. Supp. 2d at 76; Treas. Reg.

§ 1.593-5(b)(2).[11] The second exception, a "liberal interpretation" of Treasury

Regulation § 1.593-5(b)(2), applies to taxpayers who have taken a Reasonable

Addition for a tax year that is *less than* the Maximum Addition. I.R.S. Gen.

Couns. Mem. ("GCM") 33,820, 1968 WL 16122 (May 10, 1968). The

Commissioner allows such taxpayers, if a subsequent adjustment increases the

taxpayer's taxable income for the tax year, to increase the Reasonable Addition

deduction (capped by the Maximum Addition) in order to offset the additional

taxable income. Rev. Rul. 70-5, 1970-1 C.B. 142; GCM 33,820.[12] This exception

stems from a policy of allowing a "taxpayer [who] has manifested an intent to

---

[11] The regulation is reproduced at *supra* note 4.

[12] We have described Revenue Rulings as "the official I.R.S. position on application of tax law to specific facts," *Weisbart*, 222 F.3d at 98 (internal quotation marks omitted). Although not entitled to *Chevron* deference, "particular revenue rulings may be given deference to the extent that they are persuasive." *In re WorldCom, Inc.*, 2013 WL 3779354, at *9 (citing *United States v. Mead*, 533 U.S. 218, 234-35 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)). General Counsel Memoranda "are informal documents written by the I.R.S. Chief Counsel's office." *Nathel v. Comm'r*, 615 F.3d 83, 93 (2d Cir. 2010). They are also not entitled to *Chevron* deference. *Id.* We have stated in dicta that General Counsel Memoranda may also, like Revenue Rulings, be entitled to *Skidmore* deference. *Id.* We need not here determine if General Counsel Memoranda are entitled to such deference because the relevant exception is provided in both the Revenue Ruling and the Memorandum.

23

claim a bad debt reserve sufficient to offset its entire taxable income" to do so in the face of additional income that it had previously not anticipated. GCM 33,820.

For the reasons described by both the district court and the cited Revenue Ruling and General Counsel Memorandum, we hold that this second exception is an appropriate exception to the rule that reserve method taxpayers cannot retroactively claim an increased deduction. Based on this exception, the district court allowed AmBase to increase its Reasonable Addition in an amount necessary to offset Carteret's post-seizure additional income, which was not included on AmBase's initial return. *AmBase*, 834 F. Supp. 2d at 75-77. We affirm the district court on this ground.

### B. Carteret's Post-Seizure Bad Debts

The district court denied AmBase's refund claim in all other respects. *AmBase*, 2012 WL 1884874, at *4; *AmBase*, 834 F. Supp. 2d at 77. We disagree in one respect and hold that AmBase's claim should be granted to the extent that it seeks to increase its deduction to account for Carteret's post-seizure bad debts.

Our holding comes from the rule, discussed above, that bad debts must be accounted for in the year in which they become worthless. *Calavo*, 304 F.2d at 654. With respect to reserve method taxpayers, this requires the taxpayer to

24

charge off a specific bad debt against the reserve in the year such debt goes bad.

*Id.*; *Smith Elec.*, 461 F.2d at 793. By reducing the amount of the reserve, the bad

debts increase the otherwise allowable Reasonable Addition. *Smith Elec.*, 461

F.2d at 791. We hold that reserve method taxpayers must also be allowed to

increase the Reasonable Addition to account for such an increase.

Our holding is guided by the former Court of Claims' reasoning in *Smith*

*Electric*. The *Smith Electric* Court, in discussing retroactive changes made by

reserve method taxpayers, gave the following example:

> T charges a specific debt against the reserve in year 2. In year 5 the
> Commissioner challenges the addition to the reserve on the ground that
> this specific debt actually became worthless in year 1. If the Commissioner
> prevails, T's addition to the reserve for year 2 would be decreased. Since
> the charges against the reserve for the bad debts would also be decreased
> by the same amount, the reserve balance would remain the same [for year
> 2.] The regular statute of limitations would bar a claim for refund with
> respect to year 1. Defendant argues that T could *not* utilize the special
> seven-year statute and should therefore increase the addition to his reserve
> in year 5, a year totally unrelated to the debt becoming worthless.

> We cannot subscribe to such a rule of law.

461 F.2d at 793. The question in *Smith Electric* was whether the taxpayer was

permitted to account for an increase in the Reasonable Addition. In the above

example, with respect to year 2, both the charge offs and the Reasonable

Addition decrease, leaving the taxpayer's reserve unchanged. With respect to

25

year 1, the charge offs *increase*, due to the redetermination of when the debt became worthless.  The Commissioner argued that the taxpayer should not be permitted to also increase the Reasonable Addition.  The case differs from this appeal in that the Court of Claims did not look to the merits of the refund claim, but rather considered the applicability to reserve method taxpayers of the seven-year limitations period—a period which applies, under I.R.C. § 6511(d), to refund claims on account of the deductibility of bad debts.  *Id.*  The Court of Claims held that the seven-year limitations period was applicable to reserve method taxpayers.  *Id*.  However, it would be illogical for the court to apply the seven-year statue of limitations if such taxpayers could never claim a refund based on the retroactive charge off of a bad debt.  Extending *Smith Electric*'s reasoning, we hold that reserve method taxpayers may claim such a deduction.

Our holding is also guided by the exceptions to the rule of non-retroactivity discussed above.  Under the first exception discussed, a taxpayer in a tax year who has taken a Reasonable Addition equal to the Maximum Addition may increase its Reasonable Addition upon an adjustment to the taxpayer's return which increases the permissible Maximum Addition.  *AmBase*, 834 F. Supp. 2d at 76; Treas. Reg. § 1.593-5(b)(2).  With respect to the example in *Smith*

*Electric*, where a specific bad debt is deemed to be worthless in year 1 and not year 2, this exception would mean that the taxpayer may increase his Reasonable Addition in year 1 only if he previously took the Maximum Addition. We see no reason why this exception should be so limited. The fact that the Commissioner has adopted a "more liberal" reading of the rule in another context further supports our reasoning here. *See* Rev. Rul. 70-5; GCM 33,820.

The instant appeal differs from the example discussed in one respect. AmBase's additional bad debts arise, not from a redetermination of the year in which a debt has become worthless, but due to the post-seizure activity of Carteret which AmBase previously did not include on its return. AmBase was unable to properly calculate the Maximum Addition because, due to RTC's receivership and the RTC's failure to provide AmBase with the relevant records, AmBase was unable to account for Carteret's post-seizure bad debts. We see no reason why this circumstance should mandate a different result. Indeed, this situation, in which AmBase has not accounted for the bad debt at all—in either the proper year or another year—strengthens our reasoning that, in order to properly account for the bad debt, AmBase must be able to both charge off debts and increase the reserve.

Finally, the reasoning of *Wengel*, 306 F. Supp. 121, cited by the Government, does not lead to a different result. *Wengel* relates to the deductibility of *partially* worthless debts, which require both a partially worthless debt and "that the taxpayer ascertained [the worthlessness of the debt] and made the accounting entry within the taxable year." *Smith Elec.*, 461 F.2d at 793 n.3. As "[t]hese latter criteria are not necessary with respect to wholly worthless debts" under either the specific charge-off method or the reserve method, *id.*, partially worthless debts provide an exception to the rule that bad debts must be accounted for in the year in which they become worthless, and therefore *Wengel* does not conflict with our reasoning.

## C.  Additional Increase in Deduction

In all other respects we affirm the judgment of the district court.  In particular, we find no authority that supports the proposition that AmBase, which chose on its initial 1992 tax return to make a Reasonable Addition of $45 million less than the Maximum Addition, should be allowed to retroactively claim the $45 million as a deduction.  In general, "a taxpayer is not to be permitted to enlarge its reserve account retroactively."  *Rio Grande*, 36 T.C. at 664. The taxpayer must earmark the amounts in the reserves, which "are not to be

28

used for any purpose other than to apply against bad debts as they occur." *Levelland*, 421 F.2d at 246. AmBase is not permitted to enjoy the use of its funds and then retroactively decide to place them in the reserve.

We reject AmBase's argument that collateral estoppel applies to this case due to prior litigation involving AmBase's predecessor corporation, Home Group, Inc., *Home Group, Inc. v. Comm'r*, 91 T.C. 265 (1988), *aff'd on other grounds*, 875 F.2d 377 (2d Cir. 1989). We use a three-part test to determine if collateral estoppel applies: (1) whether the issues presented in the two proceedings "are in substance the same;" (2) "whether controlling facts or legal principles have changed significantly since" the first proceeding; and (3) "whether other special circumstances warrant an exception to the normal rules of preclusion." *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir. 1992). Collateral estoppel is inapplicable here because the *Home Group* litigation involved the interpretation of Treasury Regulation § 1.593-6(a), a provision applicable for "taxable year[s] beginning before July 12, 1969." That provision is not at issue here, and therefore the two proceedings are not in substance the same.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.